HORNE, *et al.* LESSEE, vs. LYETH.

Horne
vs
Lyeth

EJECTMENT in *Baltimore* County Court for a lot of ground in the city of *Baltimore*, No. 642, being part of a tract of land called *Lunn's Lot.* At the trial in the county court, it was admitted that *John Eager Howard* was, on the 2d of November 1782, seized and possessed of a lot or parcel of ground situate on *Howard-street*, in the city of *Baltimore*, beginning at the intersection of *Howard-street* and *Lexington-street*, and running thence, binding on *Lexington-street*, 4½ perches, thence S. parallel with *Howard-street*, to *Dutch Alley*, thence E. with *Dutch Alley to Howard-street*, and thence N. binding on *Howard-street* to the beginning, known and distinguished on the plat of the city by the No. 642, and is part of a tract of land known by the name of *Lunn's Lot*, long before that time granted to *Edward Lunn.* That *John Eager Howard* being so seized and possessed of said lot, by deed, duly executed, leased the same, with the appurtenances, to *Matthias Setler*, his executors, administrators and assigns, for the term of 99 years; and that *Setler* afterwards, by virtue of said deed and demise entered into possession; and being so possessed thereof afterwards, on the 12th of October 1785, did duly make and execute his last will and testament; and afterwards, on the 1st of September 1787, died in possession of the premises, leaving his said will in full force, whereby he bequeathed, among other things, as follows, viz. "Item. I give and devise to my grandson *Jacob Settler*, (son of *Matthias Settler*, Junr.) all that house and lot in *Baltimore Town* situate between the houses of Messrs. *James Allen* and *Charles Duhl*, to him my said grandson, his heirs and assigns, for ever; nevertheless I do hereby bequeath the use and benefit of the said house and lot to my son *Mathias Settler*, junior, during his natural life, and at his decease to descend as above directed. Item. I give and devise to my daughter *Catherine* the house and lot whereon I now live, with the annual income of three pounds two shillings and six pence current money, payable to me as ground rent from negro *Fanny*, and also the annual sum of four pounds sterling, payable to me as ground rent from Mr. *Wall*; all which property, and annual sums of money, I give to my said daughter during her natural life, and after her decease, I give the same to the heirs of my said daughter *Catherine;* and it is my express will and desire, that my said daughter possess and enjoy the said property from and after the decease of my wife *Catherine*, and not before. Item. I give and devise to my loving wife *Catherine*, all the rest, residue and remainder, of my estate, both real and personal, with all sums of money and interest due, or thereafter to become due, during her natural life, so that she do not waste any of the principal or original stock. And further, my will and pleasure is, that after the decease of my wife *Catherine* all my estate, both real and personal, (not specially herein before devised,)

M S, possessed of a term of years in a lot of ground bequeathed it as follows. "I give and devise to my daughter C the house and lot whereon I now live; all which I give to my said daughter during her natural life, and after her decease, I give the same to the heirs of my said daughter C."—*Held* by *Baltimore* county court, that C was entitled to the whole of the unexpired interest in the term.

be divided among my five children, (to wit,) *Abraham,* *Isaac, Jacob, Matthias,* and my daughter *Mary Strawman,* in the following manner, viz. Each of them first charging him or herself with the respective sums charged to them in my books or papers of account, and then respectively draw from the residue of my estate such sum as shall make my said four sons, and my daughter *Mary Straw-man,* all equal share and share alike." It was further admitted, that the house and lot mentioned in the said will, and thereby devised by the testator to his daughter *Catherine,* is the house and lot and premises in the said declaration mentioned, and for the recovery of which this suit is prosecuted. and is a part of the lot of ground so demised to the said *Matthias;* and also that the wife of *Matthias* entered under and by virtue of said devise in the will of *Matthias,* and was possessed of the said house and lot so devised to her, and departed this life in the life-time of *Catherine* her daughter. It was also further admitted, that *Catherine,* the daughter of *Matthias,* on or about the 28th of February 1792, was duly married to a certain *Philip Horne,* by whom she had three children, to wit, *Henry, Jesse* and *Eliza,* all of whom were born before *Philip's* death, which happened on or about the 10th of January 1796; and further, that *Catherine,* the widow of *Philip,* was afterwards duly married to a certain *Jacob Diffenbaugh,* to wit, on or about the 22d of September 1796, and that after the death of her said mother, the said *Jacob* and *Catherine* having entered into the said house and lot and premises, and being possessed thereof, and of the remainder of the said term therein yet unexpired, under and by virtue of said demise, they, the said *Jacob* and *Catherine,* did on the 3d of December 1799, duly execute a deed, assigning unto a certain *Samuel Lyeth,* his heirs and assigns, the aforesaid house, lot and premises, and their said term therein. It was further agreed, that *Jacob* and *Catherine* both departed this life before the institution of this suit, leaving one only child, a daughter, named *Maria,* who also, before the institution of this suit, was duly married to *Henry Pope,* one of the lessors of the plaintiff, and is yet living; also that the said last mentioned *Catherine* departed this life on or about the 12th of September 1815, leaving at the time of her death the aforesaid children *Henry, Jesse, Eliza* and *Maria,* her heirs and representatives, of whom *Henry* is the oldest, and he and the said *Jesse* are two of the lessors of the plaintiff, and that the said *Eliza* was, before the institution of this suit, duly married to *Solomon Jones,* one other of the lessors of the plaintiff, and is still living. The leases, entries and ousters, in the said declaration stated and set forth, are admitted; also that since the commencement of this suit *Samuel Lyeth* hath died, as hath been suggested, having first duly made his last will and testament, and thereby devised the house and lot and premises aforesaid to *Kezia Lyeth,* his widow, during her natural life, and after her death to his son *John Lyeth.* It was also admitted, that

the property bequeathed by the testator, *Matthias Setler*, to his grandson *Jacob Setler*, (son of *Matthias Setler*, Junior,) is leasehold property. Upon this state of the facts the plaintiff prayed that the court would direct the jury to find for the plaintiff.

1818.

Horne
vs
Lyeth

*Martin*, (Attorney General,) and *Mitchell*, for the Plaintiff.

*Pinkney* and *Scott*, for the Defendant.

DORSEY, Ch. J. delivered the opinion of the Court. It is stated and admitted that *Matthias Setler*, being possessed of a term of years in a lot of ground situate in the city of *Baltimore*, by his last will and testament, bequeathed it as follows: "I give and devise to my daughter *Catherine* the house and lot whereon I now live, all which I give to my said daughter during her natural life, and after her decease I give the same to the heirs of my said daughter *Catherine*."

The question arising on this will is this—What interest did *Catherine*, the daughter of the testator, take under this devise? The counsel for the plaintiff have argued that she took only an estate for life, and that after her death, her children, the lessors of the plaintiff, were entitled to the residue of the term. On the part of the defendant it has been urged, that *Catherine*, the daughter, under the true construction of the devise, was entitled to the whole of the unexpired interest in the term.

If this had been a devise of real estate the case would be too clear for argument. Because where land is limited to a person for life, and after his decease to his heirs, or the heirs of his body, the remainder to the heirs, or heirs of the body, is immediately executed in the ancestor, who becomes seized of an estate of inheritance. So if there be a lease for life, with divers remainders over, remainder to the right heirs of the first lessee, or to the heirs of his body; this is a remainder vested in the first lessee for life; and after his death, and the determination of the intermediate remainders, his heir shall be in, as heir and not as a purchaser. For in those cases the words "heirs," or "heirs of the body" are not named as words of purchase, but only to express and limit the estate intended to be conveyed; and no presumed intention arising from the circumstance of the estate being limited, in the first instance, for life, will be permitted to control their operation as words of limitation. *Shelley's* case, 1 *Coke*, 96. 2 *Roll. Abridgment*, 417. *Fearne*, 28. Upon those general principles certain exceptions have been engrafted, in which the words, "heirs of the body," have been deemed to operate as words of purchase; as where the limitation was to A for life, and after his death, to the next heir male, and to the heirs male of the body of such next heir male, the devise to the heir was considered as a remainder to him by purchase; the word "heir" was in the singular number preceded by the word "next," and

words of limitation were engrafted on it, which made the next heir the *terminus* or stock, by reference to whom the future succession was to be regulated. *Archer's* case, 1 *Coke* 66. *Fearne* 150. But if the words be heirs of the body, in the plural, in that case even words of limitation engrafted on them, if not establishing a new succession, inconsistent with the descent pointed out by the first words, will not convert them into words of purchase; as in *Shelley's* case, where the limitation was to E for life, and after his decease to the use of the heirs male of the body of E lawfully begotten, and the heirs male of the body of such heirs male lawfully begotten. 1 *Coke* 96. But if the superadded words of limitation would limit an estate of a different nature from that which the ancestors would have taken if the preceding words were construed as words of limitation, such preceding words may be construed as words of purchase. In such a case the general effect, or natural and legal import of the word "heirs," would be altered, abridged or qualified, by such subsequent express words of limitation annexed to them. So where heirs of the body, are by words of reference or qualification, explained or restrained so as to mean the first and other sons. *Lisle vs. Gray*, 2 *Lev.* 223. S. C. *Sir T. Raym.* 278. *Legate vs. Sewell*, 1 *P. Wms.* 90. So where the persons to take cannot take as heirs by that description, by reason of a distributive direction, incompatible with a course of descent; as where gavel kind lands were devised to A and the heirs of her body lawfully to be begotten, as well males as females, and to their heirs and assigns forever, to be equally divided between them, share and share alike as tenants in common, and not as joint tenants. In this case it was held, that the words heirs of the body did not operate as words of limitation, because they were corrected or explained by the words which followed, and were irreconcilable with the notion of descent; and also because there were words of fee engrafted on the words of limitation, which showed that the estates given to the children, and not the estate of A, were to be the ground work of succession of heirs; or in other words that the children of A were to be the *tirmini* for the succession to take its course from. So where the limitation is directed to the presumptive heir of the person on whom the estate for life is limited. As where lands were devised to B for life, and after his death to the heirs male of the body of B, now living, and such other heirs male or female as he should thereafter happen to have of his body. B had issue, a son C, then living. In this case it was adjudged that B took only an estate for life, and that the remainder in tail vested immediately in his son C. In this case the words "heirs male" were qualified by the appended expressions "now living," and C was clearly referred to, and designated under the character of presumptive heir. *Burchet vs. Durdant*, 2 *Ventries*, 311.

Limitations in marriage articles, as well as executory trusts, are also considered as exceptions to the general

rule.  1 *Eq. Ca. Ab.* 185, pl. 30.  *Leonard vs. Earl of*
*Sussex,* 2 *Vernon,* 526.  *Papillon vs. Voice,* 2 *P. Wms.*
471.  So where the estate limited to the ancestor is an
equitable or trust estate, and that to his heirs a use executed
or legal estate, they will not incorporate; and if the estate
for life is a legal estate, and that limited to the heirs an
equitable estate, it is presumed the effect would be the
same.  1 *Equity Cases Abridg* 389.  *Shapland vs. Smith,*
1 *Bro. Ch. Rep.* 75.  It would be needless at this time of
day to inquire on what foundation the words "heirs" or
"heirs of the body" were originally considered as words of
limitation, where a preceding estate of freehold was given
to the ancestor.  If the rule was introduced to secure to
the lord of the fee the fruits of wardship and marriage,
which he had a right to claim from the heir, who came in-
to the tenure by descent, the rule must still prevail, al-
though the abolition of the feudal tenures may have des-
troyed the reason of it.  To disregard rules of interpreta-
tion, sanctioned by a succession of ages and by the deci-
sions of the most enlightened judges, under pretence that the
reason of the rule no longer exists, or that the rule itself is
unreasonable, would not only prostrate the great land
marks of property, but would introduce a latitude of con-
struction boundless in its range, and pernicious in its con-
sequences.

Having thus briefly examined what would have been the
operation of this bequest, if the subject matter had been
a frank tenant, (and in doing this we were necessarily led
into an inquiry concerning the meaning and legal effect of
the words "heirs," and "heirs of the body," when limited
upon a preceding estate of freehold,) we shall now proceed
to consider this bequest as applicable to chattel interests
or leasehold property.

At one period of our law, if a term for years or chattel
was bequeathed to one for life, and after his death to a
third person, the ulterior limitation was considered as void,
and the whole interest of the term or thing became vested
in the first devisee; but in process of time, this doctrine
was abandoned, and courts of justice, on grounds of gene-
ral utility and public convenience sustained the super-
added limitation as an executory devise.

This brings us to the question, Is there an executory de-
vise in this case; or in other words, can the children of
*Catherine,* the daughter, claim the interest in the term, on
the ground that there is a limitation to them by way of
executory devise after the death of their mother?  And in
making this investigation we shall first consider what would
have been the true construction of this bequest if the words
"*heirs of the body*" had been used instead of the word
"*heirs.*"  When a correct result is attained by this view
of the case, analogical reasoning, in the absence of express
adjudications, may enable us to decide with some degree of
certainty on the precise case presented by the will.  In the
case of *Butterfield vs. Butterfield,* 1 *Ves.* 133, 154, the
testator devised that £400 should be put out on good secu-

rity for his son T, that he might have the interest of it for his life, and for the lawful heirs of his body; and if it should so happen that he should die without heirs of his body, it should go to his youngest son J B.  Lord *Hardwicke* decreed that the son T should take the whole in the thing devised. In *Garth vs. Baldwin*, 2 *Ves.* 646, personal property was limited to trustees to pay the profits to *Edward Turner Garth* for life, and afterwards to pay the same to the heirs of his body.  The Lord Chancellor says the case is reduced to this, a gift of personal estate to one for life and the heirs of his body—That must vest the property in him whether the testator intended it or not.  *Atkinson vs. Hutchinson*, 3 *P. Wms.* 259.  The Lord Chancellor declares that if a term of years be limited to A for life, remainder to the heirs of his body, A would take the whole interest.  As where personal estate was given to L A P for life, and after her decease to the heirs male of her body lawfully begotten, and for want of such, with limitations over.  The master of the rolls held that the whole interest vested in L A P.  *Daw vs. Chatham*, 2 *Fearne* (347) 464.  Interest of a sum of money given to A, and after his death to devolve to the heir of his body, with remainder over, vests the principal absolutely in A.  *Robinson vs. Fitzherbert*, 2 *Bro. Ch. Rep.* 127.  *Edward Webb*, in consideration of marriage between his son *Thomas*, and *Anne* his then wife, and £350 portion, did assign to a trustee the remainder of a term for 1000 years, upon trust, to permit the son to enjoy the same so long as he should live, and after their decease, to permit the heirs of the bodies of the said *Thomas*, the son, and *Anne* his wife, to be begotten.  The wife died leaving issue; *Thomas* survived and sold the interest in the term; and it was held, that the whole interest vested in him, and that therefore he could legally convey the same. *Webb vs Webb*, 1 *P. Wms.* 132. The case of *Peacock vs. Spooner*, 2 *Vernon*, 43, is the only case to be found in the books that even seems to clash with the above authorities, and that case is distinguished from the foregoing cases on the principle that the limitations were contained in a marriage settlement; and in the case of *Garth vs. Baldwin*, 2 *Ves.* 646, the Lord Chancellor says, that it was determined in the House of Lords, but with a great variety of opinion among the judges, that it was a single case, and its authority shaken by the case of *Webb vs. Webb*.

From the preceding authorities it evidently appears, that if a leasehold estate is limited to one for life, the remainder to the heirs of his body, the whole interest vests in the first taker, and that the words "for life" will not be sufficient to restrain his interest to a life estate.  But if words of limitation are superadded to the words "heirs of the body," such additional limitation is considered as indicative of an intent to give only a life estate.  *Hockley vs. Mawbey* 3 *Bro. Ch. Rep.* 82.  So, if the words "heirs of the body" are followed by words of partition or distri

1818.

Horne
vs
Lyeth

bution, the estate for life shall not be enlarged, by the force of the expression "heirs of the body," but the words of partition will be construed as indicative of an intent to give a life estate to the first devisee. *Jacobs vs. Amyatt,* 4 *Bro. Ch. Rep* 542.

By the irresistible authority of those decisions *Cathe-rine,* the daughter, must have taken the whole interest of the unexpired term, if the devise had been to her for life, and to the heirs of her body. But it has been contended, that the word *heirs* may operate as a word of purchase, and that the court will so construe it to effectuate the intention of the testator. That the word *heirs,* in certain cases, may operate as a word of purchase, is too plain a proposition to be controverted. The doctrine of contingent remainders furnishes many instances of it. If an estate of freehold be limited to A, remainder to the heirs of B, it is a contingent remainder; and if B dies in the life-time of A leaving C his heir, C will take as a purchaser, and cannot take by descent, because the inheritance was never actually or potentially vested in his ancestor B. So if leasehold property is devised to A, remainder to the heirs of B, the representatives of B will, for the same reason, take as purchasers, because nothing was devised or given to B; and such is the principle of the decisions in *Holloway vs. Holloway,* 5 *Ves,* 399, and in *Gwynn vs. Muddock,* 14 *Ves.* 488, referred to in the argument by the plaintiff's counsel. So the words "heirs of the body," may operate as words of purchase; as if an estate for life is limited to A, remainder to the heirs of the body of B, if B dies during the life of A, leaving a child or a descendant of a child, such child or descendant takes by purchase, and cannot take by descent, because his ancestor had no seizen of the fee or frank tenement. But if an estate is devised to a man and the heirs of his body, the word "heirs" is a word of limitation. In every case therefore the question whether the words "heirs" or "heirs of the body" are to operate as words of purchase or of limitation, must depend on the context and subject matter. In the cases of devises herein before referred to, the words "heirs of the body," were held to be words of limitation, and it might have been contended, with as much force of argument in that case as the present, that as the words "heirs of the body" did, in certain instances, operate as a *designatio personarum,* they should be so construed in each of those cases, and therefore the heirs of the body should take as purchasers by way of executory devise. But this argument would have been unavailing. because the court, in construing the effect of limitation in bequests of personal property in general, keep in view their legal sense and meaning as applied to frank tenement, and hence the observation of the Lord Chancellor, in the case of *Knight vs. Ellis,* 2 *Bro. Ch. Rep.* 570. He says it must have occurred to the judges, who decided those cases, that under the idea of making the rules of decision as to lease-

hold estate analagous to those which are applied to estates of inheritance, the intention of the testator must be much oftener disappointed than carried into effect; and then there can be no wonder that the court should try to get out of the technical rule, by any means it can. We ask what technical rule is here meant? The context shows that he refers to technical rules governing the limitations of frank tenements, whether the same be the rules of interpretation, established in *Shelley's* case, or elsewhere. And it was in this sense I have understood the learned counsel for the defendant, when in his luminous and eloquent argument he contended that the doctrine in *Shelley's* case had been applied as a rule of construction to ascertain the effect of limitations in bequests of leasehold estate. It has been admitted by the plaintiff's counsel, and the position has been established by a variety of decisions, that if the bequest be limited in such words as would create an estate tail in real estate, if applied to it, such words would vest the absolute interest in chattels in the first legatee. If such is the effect of a devise of a chattel interest to a man for life, remainder to the heirs of his body, why should not the same result be produced by a bequest to a man for life and to his heirs generally? If the words "heirs of the body" (which naturally point to children and their descendants) are considered as words of limitation, and enlarge the estate of the first devisee to an absolute interest, why should not the word heirs, so comprehensive in its signification, give as great an interest? If a frank tenement is limited to a man for life, and the heirs of his body, he has a limited and contracted interest—an estate in fee tail; but if it is limited to a man for life, remainder to his heirs, he has an absolute and unfettered estate. Why should the legal effect of those different limitations be so completely inverted when applied to chattel interests? Upon what principle can it be, that the more enlarged expression shall convey the least interest? It is said, that by construing the word "heirs" to be a *designatio personæ*, you fulfil the intention of the testator, evinced by his giving a life estate to *Catherine*, his daughter, and thereby secure a provision for the grandchildren, for whom the testator was, under a natural obligation to provide. Refer to the case of *Butterfield and Butterfield*, and it will be found that this consideration had no influence with the Lord Chancellor, when he decided that the son of the testator should have an absolute interest in the money, which had been devised by the grandfather to the heirs male of the son, after the death of the son. There the grandfather, it may be presumed, intended to provide for his grandchildren, under the restricted limitation of "heirs of the body" of the son; but this intention was not legally evinced, and therefore the father took all, to the exclusion of his children. So in the case of *Webb and Webb*, where the father, by a marriage settlement, in consideration of a portion brought by his son's wife, limited personal property to his son for life, then to the wife of

1818.

Horne
vs
Lyeth

the son for life, and after their death, to the heirs of the body of the son and his wife. The son survived the wife, and it was decreed that the whole property vested in him. Here the issue of the marriage could claim no interest in the property settled, though the limitation was to the father and mother for life, and after their death to the heirs of their body. It might fairly be presumed that the children of the marriage were intended to be benefited by the marriage settlement, more especially as an estate for life only was limited to the father and mother, with remainder to the heirs of their bodies: Yet the Chancellor held, that the "heirs of their bodies" were words of limitation. If those cases are law, and their authority has not been called in question by the counsel for the plaintiff, how can the natural and legal sense of the word "heirs" in this case be restrained by the consideration of the supposed intention of the testator to provide for the children of *Catherine*, the daughter, founded on the circumstance of an estate for life being limited to her. The plaintiff's counsel have relied on the case of *Clare vs. Clare, Cas. temp. Tal.* 21, as decisive of the present case. There a devise to A of a term for life, and after his death to his issue, was held not to vest the whole interest in A, but that the issue of A should take after his death. Before this case can be considered as conclusively deciding the present case, it is presumed that the counsel for the plaintiff must prove a position, which he assumed in the course of his argument, and that was, that the words "issue," "children" and "heirs," were convertible terms. Unless this position is true, the case of *Clare and Clare* cannot affect the present question. That the word "issue" in its natural, and often in its legal sense, means children, and is therefore a word of purchase, no one will question; but that the word "heirs" either in its natural or constructive sense, generally means issue or children, must be denied; that there are certain cases in which the word "heirs," is used in the same sense as children or issue is evident, but in all those cases, it receives its restricted meaning, by being associated with words of reference or qualification, which show that it was not intended to be used in its legal sense. The word "issue" in grants is exclusively a word of purchase. In testamentary dispositions of real estate, it may be either a word of purchase or limitation, and in bequests of personal property, it is a word of purchase, as appears from the case of *Clare and Clare*, and the case of *Knight and Ellis* herein before referred to. But it is said that no decision can be found in which the word "heirs," in a case like the present, has been construed to be a word of limitation. This objection certainly is not entitled to weight, unless it can be shown that it has been adjudged that it is a word of purchase, or unless it can be proved by argument, founded on analogy and principle, that it ought to be so considered. The counsel on either side have not been able to refer to any decision

on the precise point, and the court have endeavoured to prove, that all the analogies of the law are opposed to the construction contended for by the plaintiff. They therefore are of opinion, that the plaintiff is not entitled to recover, and refuse to give the opinion to the jury as prayed. The plaintiff excepted. Verdict and judgment for the defendant. From which judgment the plaintiff appealed to the Court of Appeals, but did not prosecute his appeal *(a.)*

*(a)* Though no opinion in this case was given by the Court of Appeals, the Reporters have supposed its publication would be acceptable to the profession, because of the evident care with which the judgment of the court below was pronounced, and the well merited reputation of the Judge by whom it was delivered. -