Wagner v. Bissell.

WAGNER *v.* BISSELL.

The common law rule, that every man is required to keep his cattle within his own close, under the penalty of answering in damages for all injuries arising from their running at large, is not in force in the state of Iowa.

Where in an action of replevin for certain cattle, the defendant answered, denying the plaintiff's right to the possession of the cattle, and also alleged as a special ground of defence, that the cattle, (which he admits to be the property of the plaintiff), did, on the 17th day of August, 1856, trespass upon the *uninclosed* land of defendant, and while so trespassing, and after he had suffered damage thereby to the amount of fifty dollars, he distrained the same, as he had a right to do; and while thus lawfully distrained, and while he thus rightfully had the possession, the said plaintiff replevied the said cattle, without paying, or offering to pay for the damages so sustained, to which answer the plaintiff demurred, and the demurrer was sustained by the court; and where the defendant refused to answer over, and judgment was thereupon rendered against him; *Held,* That the demurrer was properly sustained.

### Appeal from the Jones District Court.

THIS was an action of replevin for certain cattle.  Defendant answered, denying the plaintiff's right to the possession, and also alleging as a special ground of defence, that said cattle, (which he admits to be the property of plaintiff,) did on the 17th day of August, 1856, trespass upon the *uninclosed* land of defendant, and while so trespassing, and after he had suffered damage to the amount of fifty dollars, he, said defendant, distrained the same, as he had a right to do ; and while thus lawfully distrained, and while he thus rightfully had the possession, the said plaintiff replevied the said cattle, without paying, or offering to pay, for the damages sustained.  To this answer, the plaintiff demurred, which was sustained.  Defendant refused to answer over, and judgment being against him, he appeals.

*W. J. Henry,* for appellant.

The demurrer of the plaintiff to the answer of the defendant, should have been overruled.  The demurrer is to the

Wagner v. Bissell.

whole answer of the defendant, when the answer presents a general and special bar to the plaintiff's cause of action. The question raised by the special matter set up by the defendant in his answer, has never been adjudicated by the Supreme Court of this state, and is one of vital importance to the farming interest of the state. The common law authorities are uniform in holding, that one man is not bound to fence his land against the cattle of another; but on the contrary, every man is bound under the penalty of being counted a trespasser, to keep such animals as are the subjects of absolute property, upon his own soil. See 1 Cowen, 91; 16 Mass. 33; 19 Johnson, 385; 2 H. Bl. 527.

It only remains then, to be seen how far this principle of the common law has been changed by the legislation of this state. Section 913 of the Code, provides that when any person is injured in his land, he may recover his damages, by an action against the owner of the beast, or by distraining the beast doing the damage; provided, that if the beast were lawfully on the adjoining land, and escaped therefrom in consequence of the neglect of the person suffering the damage, to maintain his part of the division fence, the owner of the beast shall not be liable for such damage. This section of the Code may be said to embrace all the statutory provisions now in force, in any manner changing the common law. This provision of the Code is analogous to the provisions made by the statute of the state of New York, under which there have been a number of adjudicated cases, which establish the principle that the ordinary declaration in an action of trespass *quare clausum fregit*, is sufficient to entitle the plaintiff to recover in the first instance, and the burthen of averring and proving that the beasts were lawfully on the adjoining close, and escaped therefrom in consequence of the neglect of the party injured to maintain his part of the division fence, or that the defendant had a license or a right of common in the land of the plaintiff, is on the defendant. In *Wells* v. *Howell*, 19 Johnson, 385, it was decided that an owner of an uninclosed field, may maintain trespass against an owner of a horse grazing there, unless the defendant shows

a right to permit his cattle to go at large. The nucleus of all the authorities in relation to this subject, is the ancient maxim that no man shall take advantage of his own wrong or negligence in his prosecution or defence against another, and that he is bound to use anything that is his, so as not to hurt another by such user. See 6 Mod. 314.

Thus the court will see from the weight of authority, that the question in relation to the right of the plaintiff to maintain replevin for cattle impounded, damage feasant cannot be raised on demurrer, as the section of the Code above referred to, gave to the defendant the right to impound cattle thus taken, unless they were rightfully on the adjoining close. The doctrine enunciated by the Supreme Court of the state of Illinois, in the case of *Seely* v. *Peters*, 5 Gilm. 130, stands unsupported by the decision of any other state of the Union, and indeed it cannot be entitled to much weight. It is a case too, upon which the court was divided in opinion, and I think that the dissenting opinion of Judge CATRON, is entitled to far more consideration than the opinion of the majority of the court; but as this and other decisions of the Supreme Court of Illinois, are relied upon by the counsel for the plaintiff, I propose to look more particularly into the authority upon which they are based, and first: It was not pretended that these decisions were founded upon the common law; but upon the contrary, the court itself admits that it was an alteration of the common law principle, and claimed to find their authority under a statute of the state, but as we have not a similar statute, those cases can be entitled to but little consideration; for indeed if such a statute did exist, I should be inclined to doubt its constitutionality; as the right to the soil is an absolute right, and where such right is once acquired, no subsequent act of legislation should be allowed in any case to limit the exercise and enjoyment of such right.

Again, it is claimed that there is a right of common in this state; but if such a right exists, it must be founded upon custom, as we have no statute granting any such right, and it will scarcely be seriously contended that a right founded

upon custom would be good, as one of the incidents necessary to make a good custom is, that it must have existed so long, that the memory of man runneth not to the contrary; and in a state that has been inhabited only about twenty years, such custom is not good, and if there was a custom existing in some parts of the state, allowing cattle to run at large, it could not be taken notice of *ex officio* by the court, on a demurrer to the defendant's answer, but should have been pleaded.

The question in relation to stock running at large, was made the subject of legislative action, in this state, in the year A.D. 1844. See Acts of 1844–5, p. 22, § 7. By which act it was provided, that in all cases where there was no fence, or if in the opinion of the fence viewers, the fence over or through which the trespassing animal entered, be not a lawful fence, according to the requirements of the first section of this act, no damage shall be recoverable. This act was repealed by the Code, § 913. The action of the legislature shows conclusively, that this principle of common law has been adopted in this state, and that it is now the common law of the state.

*Joseph Mann,* for the appellee.

The plaintiff contends that he had a right to hold defendant's cattle for damage done by them upon uninclosed land, until such damage was paid; which perhaps would be correct, if the common law upon the subject of inclosure prevails in this state, and he had complied with the requirements of the statute in making his statement, describing the land, &c., and having the fence viewers to assess the damage, &c.

Chapter 53 of the Code, under which the plaintiff in error bases his right to distrain the defendant's cattle, presupposes him to have his land inclosed with a lawful fence, for section 913, provides, "that if the beast be on the adjoining land, and escaped therefrom in consequence of the neglect of the person suffering the damage, to maintain his part of the

division fence, the owner of the beast shall not be liable for such damage."

The common law rule, that the owner of a close was not bound to fence against the adjoining close, has never been adopted in this state. There is no principle of the common law so inapplicable to the condition of our country and people, as the one which is sought to be enforced now for the first time, since the settlement of the state. It has been the custom in Iowa, so long that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large, and no one has questioned their right to do so, although hundreds of cases must have occurred where the owners of cattle have escaped the payment of damages on account of the insufficiency of the fence. Not until now has it been contended, that the common law rule, that the owner of cattle was bound to fence them up, was in force in this state.

The universal understanding of all classes of the community, upon which they have acted, by inclosing their crops and letting their cattle run at large, should be entitled to consideration in determining what the law is. See 1 Bl. Com. 76; 2 Ib. 31; Lill. Reg. 516.

It would be an absurdity for the legislature to pass acts from time to time, (which has been done,) restraining certain stock from running at large, if all stock were by law prohibited from running at large.

The plaintiff shows in his answer, that the land damaged was not inclosed, but in common, so that if there was any damage done, it was occasioned by his own negligence, and he has suffered *damnum absque injuria.* See 12 John. 433. In Illinois, where there is a similar statute to our own, it has been decided that the common law requiring the owner of cattle, hogs, &c., to keep them upon his own land, does not prevail there, and that the tenant of land in this state is bound to fence against cattle. See 5 Gilm. 130, and 13 Ill. 609.

The plaintiff admitting that the cattle belonged to defendant, and that he had no fence on the land damaged, and hav-

Wagner v. Bissell.

ing failed to show in his answer, that the fence viewers had assessed to him any damage, but on the contrary, admitting that the defendant was damaged in the sum of five dollars, for the wrongful detention of the cattle, the court below were justified in entering judgment for the defendant in error, and it should be affirmed.

WRIGHT, C. J.—Appellant first claims, that there was error in rendering final judgment on the demurrer, for the reason that it was to the whole answer, and should have been overruled, as to so much as denied, or took issue upon the material allegations of the petition. This objection would be clearly good, but for the fact that the record in substance shows that this part of the answer was abandoned. An examination of the judgment satisfies us, that the defendant relied upon his special grounds of defence, and admitted that if these were not good, he could not gainsay plaintiff's right ·to recover. By this admission, he must be bound.

There is then but one question in the case, and that is, whether the defendant for the reasons stated in his answer, was entitled to the possession of the property, as against the plaintiff and owner. We are of opinion that he was not, and that the demurrer was therefore properly sustained.

That at common law, every man was bound to keep his cattle within his own close, under the penalty of answering in damage for all injuries arising from their being abroad, is admitted by all. And a part of the same rule is, that the owner of land, is not bound to protect his premises from the intrusion of the cattle of a stranger, or third person; and that if such cattle shall intrude or trespass upon his premises, whether inclosed or not, he may, at his election, bring his action to recover the damages sustained, or distrain such trespassing animals, until compensated for such injury. We need not at present stop to ascertain the origin or reason of this rule. It is sufficient to say, that as a principle of the common law, it is well, and we believe universally settled. We are then led to inquire, whether independent of any statutory provisions, this rule is applicable to our condition and

circumstances as a people? and if it is, then whether it has, or has not, been changed by legislative action?

Unlike many of the states, we have no statute declaring in express terms, the common law to be in force in this state. That it is, however, has been frequently decided by this court, and does not, perhaps, admit of controversy. But while this is true, it must be understood that it is adopted only so far as it is *applicable* to us as a people, and may be of a general nature. At this time, we need only discuss the question, whether the principle contended for, is applicable? for there can be no fair ground for claiming that it is not of a general nature.

We have assumed, that it is only so much of the common law as is *applicable*, that can be said to be in force, or recognized as a rule of action in this state. To say that every principle of that law, however inapplicable to our wants or institutions, is to continue in force, until changed by some legislative rule, we believe has never been claimed, neither indeed could it-be, with any degree of reason. What is meant however, by the term *applicable*, has been thought to admit of some controversy. As stated by CATRON, J., in the dissenting opinion in the case of *Seely* v. *Peters*, 5 Gilm. 130; " does it mean applicable to the nature of our political institutions, and to the genius of our republican form of government, and to our constitution, or to our domestic habits, our wants, and our necessities?" He then maintains that the former only is meant, and that to adopt the latter, is a clear usurpation of legislative power by the courts. A majority of the court held in that case, however, as had been previously decided in *Boyer* v. *Sweet*, 3 Scam. 121, " that in adopting the common law, it must be applicable to the habits and condition of our society, and in harmony with the genius, spirit, and objects of our institutions." And we can see no just or fair objection to this view of the subject. Indeed, there would seem to be much propriety in saying, that the distinction attempted, is more speculative than practical or real. For what is applicable to our wants, habits and necessities as a community or state, must necessarily to some ex-

tent, be determined from the nature and genius of our government and institutions. Or, in other words, to determine whether a particular principle harmonizes with the spirit of our institutions, we must look to the habits and condition of the society which has created and live under these institutions. We have adopted a republican form of government, because we believe it to be better suited to our condition, as it is to that of all people—and thereunder we believe our wants, rights,' and necessities, as individuals and as a community, are more likely to be protected and provided for. And the conclusion would seem to fairly follow, that a principle or rule which tends to provide for, and protect our rights and wants, would harmonize with that form of government or those institutions, which have grown up under it.

But, however this may be, we do not believe that in determining as a court, whether a particular rule of the unwritten law is applicable, we are confined alone to its agreement or disagreement, with our peculiar form of government. To make the true distinction between the rules which are, and are not, applicable, may be frequently embarrassing and difficult to courts.

Where the common law has been repealed or changed by the constitutions of either the states or national government, or by their legislative enactments, it is of course, not binding. So also, it is safe to say, that where it has been varied by custom, not founded in reason, or not consonant to the genius and manners of the people, it ceases to have force. Bouvier's Law Dict., title Law Common. And in accordance with this position, are the following authorities: "The common law of England, is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation." *Van Ness* v. *Packard*, 2 Peters, 137. And see other remarks of the learned judge, in delivering the opinion in that case, page 143, which have a bearing upon the principal question involved in this.

In *Goring* v. *Emery*, 16 Pick. 107, in speaking of what parts of the common law and the statutes of England, are to be taken as in force in Massachusetts, SHAW, C. J., says: "That what are to be deemed in force, is often a question of difficulty, depending upon the nature of the subject, the difference between the character of our institutions, and our general course of policy, and those of the parent country, *and upon fitness and usage.*"  And in *The Commonwealth* v. *Knowlton*, 2 Mass. 534, it is said, that "our ancestors, when they came into this new world, claimed the common law as their birthright, and brought it with them, except such parts as were adjudged inapplicable to their new state and condition."

In Ohio, the rule is laid down as follows: "It has been repeatedly decided by the courts of this state, that they will adopt the principles of the common law, as the rule of decision, so far only as those principles are adapted to our *circumstances, state of society, and form of government.*"  *Lindsley* v. *Coats*, 1 Ham. 243 ; see also *Penny* v. *Little*, 3 Scam. 301.

Is the rule of the common law, relied upon by the appellant in this case, applicable to our situation, condition, and usage, as a people?  Is it in accordance with our habits, wants, and necessities?  As applied to this state, is it founded in reason and the fitness of things?  The legislature has certainly not so regarded it.  On the contrary, we hope to be able to show, that what legislation we have, clearly recognizes the opposite rule.  At present, we are considering the question without reference to any legislative interpretation or action.

These same inquiries were substantially discussed in the case of *Seely* v. *Peters*, above referred to ; and as we could not hope to answer them more satisfactorily than is there done, we adopt the language used in that case, the appropriateness of which, as applied to this state, will be fully appreciated, when we reflect that in their resources and necessities, Illinois and Iowa, are almost twin sisters.  Both alike are agricultural states—both alike have large and extensive prairies—and are alike destitute of timber, as compared with the eastern and older states of the Union.

Says TRUMBULL, J., in delivering that opinion : " However well adapted the rule of the common law may be to a densely populated country like England, it is surely but ill adapted to a new country like ours. If this common law rule prevails now, it must have prevailed from the time of the earliest .settlement of the state, and can it be supposed that when the early settlers of this country located upon the borders of our extensive prairies, that they brought with them, and adopted as applicable to their condition, a rule of law, requiring each one to fence up his cattle ? that they designed the millions of fertile acres stretched out before them, to go ungrazed, except as each purchaser from the government, was able to inclose his part with a fence ? This state is unlike any of the eastern states in their early settlement, because, from the scarcity of timber, it must be many years yet, before our extensive prairies can be fenced ; and their luxuriant growth, sufficient for thousands of cattle, must be suffered to rot and decay where it grows, unless settlers upon their borders are permitted to turn their cattle upon them. Perhaps there is no principle of the common law, so inapplicable to the condition of our country and the people, as the one which is sought to be enforced now, for the first time, since the settlement of the state. It has been the custom of Illinois, so long that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large. Settlers have located themselves contiguous to prairies, for the very purpose of getting the benefit of the range. The right of all to pasture their cattle upon uninclosed ground, is universally conceded. No man has questioned this right, although hundreds of cases must have occurred, where the owners of cattle have escaped the payment of damages on account of the insufficiency of the fences through which their stock have broken ; and never till now, has the common law rule, that the owner of cattle is bound to fence them up, been suffered to prevail, or to be applicable to our condition. The universal understanding of all classes of community, upon which they have acted by inclosing their crops, and letting their cattle run at large, is entitled to no little

consideration in determining what the law is; and we should feel inclined to hold, independent of any statutes upon the subject, on account of the inapplicability of the common law rule to the condition and circumstances of our people, that it does not, and never has, prevailed in Illinois."

The learned judge then proceeds to show, that it is not necessary to assume that ground in the case before him, for the reason, as he says, that their entire legislation, clearly shows that this rule of the common law never prevailed in that state.    In like manner, we now propose to refer to some of our own legislation : which we think, will clearly show, that it was never supposed to prevail in this state. / And in doing so, we shall confine ourselves to the Code and the laws passed subsequent thereto ; for up to that time, we believe it to be conceded, that this rule of the common law did not obtain in Iowa.

Chapters 52 and 53 of the Code, relate to the rights and duties of adjoining owners, in building and keeping up partition fences, and the right of a party to recover damages, where the trespassing animal enters upon the injured land, from an adjoining close.    Nothing is said as to the duty of the party to keep a fence against trespassing animals, *not* upon an adjoining inclosure.    Neither by the Code, have we any definition of a lawful fence.    The *only* provision that seems to bear upon the question, is to be found in section 114, which gives the county judge the power to submit to the people of his county, the question, " whether stock shall be permitted to run at large, or at what time it shall be prohibited ?"

By chapter 105, Laws of 1853, however, a *lawful fence* is particularly described and specified.    And this chapter has, beyond doubt, reference to the outside fences of an inclosure, as contradistinguished from the partition fences which are provided for by the Code.    Any comment upon the object and purpose of this statute, we will reserve until we have referred to others, which we think have a legitimate bearing upon the question before us.    Chapter 104 of the same laws, relates to the taking up of " water crafts, lost goods, and es-

trays." In section 8 of this act, is found this language: "Provided, that nothing in this act shall be so construed as to authorize any person to take up or stop any estray animal, between the first day of May, and the first day of November, unless the same be a work beast, and manifestly straying from its owner." In 1851, an act was passed, submitting to the people of the counties of Scott, Cedar, and Jones, the question, whether swine and sheep, or either of them, should or should not run at large within those counties. The election was to be held by ballot, and if a majority of the votes cast in either of said counties, should be either "swine not at large," or "sheep not at large," or both not at large, *then* the owners thereof were required to *restrain the same from running at large;* "and in the event of a failure so to do, he shall be liable for any and all damages done by his swine and sheep, or either of them, so running at large, to be recovered by action of trespass, by the party injured." Laws of 1851, chap. 33. At the same session, a similar act was passed, "restraining swine from running at large in Jackson county." Chapter 73, 173. In 1855, we find an act "prohibiting certain male stock from running at large." By this act, it is provided, that no stallion, or jack, bull, boar, or ram, shall after the taking effect of the same, be allawed to run at large; and any person aggrieved, is authorized forthwith to restrain such animal, and give immediate notice thereof to the owner, and if the owner of such animal, after being notified, shall refuse to keep up or prevent such animal from running at large, he is subject to a fine not exceeding five dollars, for every such offence. Laws of 1855, chap. 135.

This brief reference to these several acts, must be sufficient, in our opinion, to satisfy any mind that the legislature never understood that the rule of the common law prevailed in this state. We do not maintain that these provisions expressly change the common law rule. And did we believe that this principle had, at any time, been well established in this state, we should perhaps hold that it had not been changed by these different statutes. Where, however, it is to say the

least, doubtful, whether the rule contended for, is in accord-ance with our situation, condition, and wants as a people—where for a series of years there has been no legislation re-cognizing the existence of such a rule—and where custom and habit have uniformly negatived its existence, we feel en-tirely justified in giving force to these acts, which if they do not expressly, certainly do impliedly, change the unwritten law.

Let us ask, upon what other fair hypothesis it is, that a reason can be found for the passage of these several acts? If the common law rule, requiring the owner to keep up his stock prevails, or has prevailed, in this state, where the ne-cessity or propriety of this legislation? What object could there be in defining a lawful fence, if no man is required to inclose his cultivated lands? If no fence is required to keep out stock, why so particular in saying what shall constitute a lawful fence? Again, if no stock are allowed to run at large, why is it that an estray animal, other than those of a certain kind, cannot be taken up for six months of each year? Can any person for a moment believe, that the legislature could have contemplated that it was contrary to law for such animals to be out of an inclosure, and at the same time pass an act, that they should not be taken up for half of each year?

And again, if the common law rule prevails, why pass two several acts, authorizing the people of Jackson, Jones, and other counties, to determine by an election, whether certain animals should, or should not, run at large—and in those acts provide, that if the majority decided *against* these ani-mals running at large, then the owners were to restrain the same, but make no provision that the owners were to be lia-ble, if the majority should be the other way? If they were bound to restrain the same any how by the general law, why these special statutes? And with how much force does the argument derived from these laws, apply to the case before us, which arose in Jones county, one of the counties named in the act of 1851? Why pass this law for the benefit of the county, if already the general law was, as is claimed by

Wagner v. Bissell.

the appellant? But once more; if all stock is to be kept inclosed, what necessity was there for the act of 1855, prohibiting certain male animals from running at large? According to appellant's argument, they were not allowed, and this law was therefore unnecessary. We cannot believe that all these acts were passed without an object. We are bound to believe, that the legislature acted with reference to the law as it stood, and that they understood it to be, that stock might lawfully run at large, and that the owner thereof was not liable for any injury sustained, unless the person injured had an inclosure—an inclosure made by a lawful fence. And in the language of the case from Illinois, before quoted, "if there ever was a case where cotemporaneous construction and acquiescence, could be properly resorted to, for the purpose of ascertaining the law, this is surely that case, both as regards the right of stock to run at large, and the necessity for fencing against them." And if, in the language of MASON, C. J., in *Hill* v. *Smith et al.*, Morris, 70, custom can, when long acquiesced in, recognized, and countenanced by the sovereign power, repeal, as well as make laws, then it certainly may change a principle of the common law. And especially so, when the legislature, by the enactment of statutes, recognizes by implication at least, a rule that is clearly at variance and incompatible with the former one, or the one existing at common law.

Judgment affirmed.