Cowenia v. Hannah.

---

AMELIA COWENIA et al., APPELLANTS, v. D. B. HANNAH et al., RESPONDENTS.

### Appeal from Multnomah County.

TREATY.—Article III of the treaty of 1846 between the United States and Great Britain, construed, that neither power intended in any way to dispose of the soil or embarrass the right of eminent domain.

TITLE.—That the only title during joint occupancy would be a mere possession, and would extend only to the land actually occupied.

DONATION LAW.—The act of 1850, called the donation law, makes no provision for one dying before the passage of the law—it only provides for persons in esse. Nor did that act enlarge possessory rights.

IN this case the appellants claim six hundred and forty acres of land in Multnomah County. They allege that a British subject, William Johnson, was residing on this land prior to the treaty of 1846 between Great Britain and the United States, fixing the northern boundary of Oregon territory and terminating the convention of 1818, and that the third article of the treaty of 1846 gives these appellants, who claim under him, Johnson, a title to this land against the defendants, who have a patent to the same from the United States.

Demurrer to complaint sustained.

*Stout & Shattuck*, for appellants.

Article 3 of the treaty of 1846 was intended to give the land then occupied by British subjects, in accordance

Cowenia v. Hannah.

with regulations then existing in Oregon territory (4th sec. Don. Law). Congress considered the treaty as a *grant of land.* The donation law respects such titles. (2 How. 591; 14 Peters, 353.)

First treaty was in 1818, and existed for ten years, and in 1827 was continued indefinitely, and the treaty of 1846 defined final position of rights.

*Wait & Parrish,* for respondent.

If the "possessory rights" of British subjects have not been respected, that fact gives them no right to the soil—such claims are adjusted in article 1, treaty of 1863.

Johnson would only in any event only have such property as he actually had enclosed.

What are possessory rights? (5 Wallace, 599; 6 Wallace, 663.)

British subjects had only an estate analogous to an *estate at will.*

The British subjects were here only by permission or license, and that would expire either by *removal of license*— by revocation—by expiration of the title of the licensor.

What is a license? (Wash. Read prop., p. 412; 11 Mass. 533; 7 Taunt, 374; 15 Wend. 380.)

The possessory rights of British subjects, pushed to the utmost extent, are only:

1st. Rights to the possession of the land actually occupied by them at the time of the treaty.

2d. Right to use the land at that time occupied, as they had been accustomed to use it.

3d. To maintain possessory action against trespassers.

A transfer of sovereignty does not disturb existing property rights. (9 Peters, 117.)

Possession can *never* confer title when it is permissive, but only when it is adverse. The legislature and judicial departments have sanctioned our construction of the treaty —by passing the land law—by extending the pre-emption laws—by judicial decision. (*Lownsdale et al.* v. *Parrish,* 21 How. 290.)

BOISE, J.   The 3d article of the treaty of 1846 provides "in the future appropriation of the territory, south of the forty-ninth parallel of north latitude, as provided in the first article of this treaty, the possessory rights of the Hudson Bay Company, and of all British subjects, who may be already in the occupation of land or other property lawfully acquired within said territory, shall be respected." It is claimed that this language was meant to confer titles on the persons, named in this article as British subjects, having possessory rights to land within the territory; for, it is not a mere possession that is here asserted, but a fee simple title.   If the treaty only conferred a mere right of possession, then, whenever that possession was abandoned by the occupant, it would cease.   It would also determine with the death of the occupant; for a mere title to possession does not descend to heirs; and, if simply personal, cannot be assigned unless it be for a term.   In determining this question, it is important that we look at the history of British occupation in this territory, prior to the convention of 1818, between the United States and Great Britain.   The United States claimed the country drained by the Columbia river by right of discovery.   Great Britain was also claiming the same right to it.   The convention of 1818 by the third article provided as follows, to wit: "It is agreed that any country that may be claimed by either party, on the northwest coast of America, westward of the Stony mountains, shall, together with its harbors, bays and creeks, and the navigation of all rivers within the same, be free and open for the term of ten years, from the date of the signature of the present convention, to the vessels, citizens and subjects of the two powers; it being well understood that this agreement is not to be construed to the prejudice of any claim which either of the two high contracting parties may have to any part of the said country, nor shall it be taken to affect the claims of any other power or state to any part of said country; the only object of the high contracting parties, in that respect, being to prevent disputes and differences among themselves."   This article was extended in

1827, and continued in force until the treaty of 1846, under which appellants claim title. I think it apparent from the language of this article, that it was the intention of the two nations, that neither should in any wise dispose of the soil, or in any way embarrass the right of eminent domain, during the continuance of the convention of joint occupancy, so that no title could be acquired, during that time, higher than a mere possession, and this possession would extend no farther than the land actually occupied.

The treaty of 1846, treated of these lands as they then were; and had the parties intended to raise these possessory rights to a higher title, it would have been so provided. I think these possessory rights would cease on being abandoned, so that the possessor became disseized by his own voluntary failure to occupy; or, on his death, as such rights would not descend to heirs; and further, I think that as Johnson died before the passage of the Act of Congress of 1850, September 27th, he was not one who could be provided for by that act, as that only provided for persons *in esse*. Nor do I think it was the intention of the Act of Congress of September 27, 1850, to enlarge the possessory rights, provided for in the treaty of 1846, but only to recognize them, to the extent that they had been granted, and to exclude those claiming under the treaty, from any benefit under the Donation Law; and all that class of persons, named in the treaty, would have been excluded without this provision, for they are described as *British subjects;* and none but native citizens, or persons who were naturalized, could obtain land under the act of 1850; and when a person becomes naturalized he is no longer a citizen of his former sovereignty, there is a change in his relations to his adopted country; and by the theory of our government he would cease to be a *British subject.* It was intended that such should not claim under the treaty, and also under the Donation Law; and a claim, under the latter, was a surrender of possessory rights under the treaty.

The judgment will be affirmed.