## Case No. 14,113.

### TOWN v. DE HAVEN et al.

[5 Sawy. 146.] [1]

Circuit Court, D. Oregon.    April 22, 1878.

TREATY—OREGON BOUNDARY—BRITISH SUBJECTS—LAND OCCUPANCY—TITLE—ACT OF CONGRESS—PROOF OF CLAIM.

1. David Gervais, the husband and father of plaintiff's vendors, was a British subject in the occupation of six hundred and forty acres of land under the provisional government of Oregon at the date of the Oregon treaty of June 15, 1846, and continued in the actual possession of the same until his death in 1853, when his widow and administratrix made a claim under said treaty for the premises for herself and children in the surveyor-general's office, and made proof of these facts, but her claim was disregarded and the land taken up under the donation act by the defendants and patented to them by the United States in 1866. *Held*: (1) That the stipulation in the treaty by the United States, that it would respect "the possessory right" of Gervais was not a grant but a mere promise which, of itself, conferred no right to or in the soil, and for the violation of which Gervais would only have a claim against the United States for compensation in money or kind: (2) Semble, that by the proviso to section 4 of the donation act of September 27, 1850 [9 Stat. 497], congress declared that Gervais was entitled to a grant of the land occupied by him as a possessory right, but provided no means by which he could claim the same or make proof of the facts necessary thereto before the land department of the country.

2. The ruling in Hall v. Russell [Case No. 5,943] followed and applied in this case.

This suit is brought by the complainant [George Town], a citizen of the state of New York, to obtain a conveyance from the defendants [William De Haven and wife and others], of a certain tract of land situate in Marion county, Oregon, and being parts of sections 29 and 30, in township 5 south, range 2 west, Wallamet meridian, containing six hundred and forty acres of the value of more than five thousand dollars.

Addison C. Gibbs, for complainant.
E. C. Bronnaugh, for defendant.

DEADY, District Judge. The material facts and allegations contained in the bill are briefly these: That David Gervais, a British subject, who was born in Oregon territory, in the year 1816, and died therein on August 22, 1853, settled upon the premises in controversy in November, 1845, while said territory was still in the joint occupation of Great Britain and the United States, and occupied and cultivated the same until his death; that said David died intestate, leaving Mary Ann Gervais to whom he was married in 1841, as his widow, and two children, Margaret Gay and Frank Gervais as his sole heirs at law; that said Mary Ann was duly appointed administratrix of the estate of the deceased, and as such administratrix, on behalf of herself and said children, did on November 10, 1853, notify the surveyor-general of Oregon of the claim of said estate to the premises, and that she claimed the same "as the possessory right" of the deceased by virtue of the treaty with Great Britain of June 15, 1846, in regard to limits westward of the Rocky Mountains, and at the same time filed with said surveyor "the necessary proofs" of these facts; that said widow and children thereupon "became the owners of said premises and entitled to a patent therefor, and to full protection of their possessory rights under the laws of the United States and the treaty aforesaid;" that no patent has ever issued to said widow or children, nor have their possessory rights been otherwise respected, but the same has been denied and a patent to the premises issued by the United States on September 6, 1866, to the defendants, Andrew De Haven, and Polly his wife, who, with the defendants, William De Haven and Michael Fahy, to whom said Andrew and Polly have conveyed an interest therein, claim the whole of said lands as their own, excepting one hundred acres, claimed in his own right by the defendant Earle; and that said widow and children inherited the premises from said David Gervais and have since conveyed the same to the complainant, who is now the owner thereof.

The defendant demurs to the bill for sundry causes. The fifth and last cause is a want of equity. In support of this, it is maintained that the possessory right guaranteed to David Gervais by the third article of the Oregon treaty of June 15, 1846 (U. S. Pub. Treat. 321), terminated with his death in 1853, citing Cowenia v. Hannah, 3 Or. 468. This article of the treaty reads as follows: "In the future appropriation of the territory south of the forty-ninth parallel of north latitude, as provided in the first article of this treaty, the possessory rights of the Hudson's Bay Company, and of all British subjects who may be already in the occupation of land or other property lawfully acquired within the said territory, shall be respected."

At the date of this treaty there were some thousands of American citizens and British subjects settled in the Oregon territory south of the forty-ninth parallel under and by virtue of the third article of the convention of October 20, 1818, commonly and properly called the treaty of "joint occupation," which in effect provided that the country should be free and open to the "citizens and subjects" of the two governments until otherwise provided. U. S. Pub. Treat. 299; McKay v. Campbell [Case No. 8,840]. The occupation of the territory by these citizens and subjects was regulated by the provisional government, an authority created and sustained by both, during

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

this period. As a rule, each male adult citizen and subject was allowed to occupy and possess six hundred and forty acres of land so long as he improved and cultivated the same. The settler might abandon or dispose of his location and take up another; but in case of his death his possession did not descend or pass to his children or relatives, but the "claim" together, with the improvements thereon was disposed of by the administrator as personal property.

This was the "possessory right" which the United States in the future appropriation or disposition of the soil undertook to respect. As a just nation, the obligation to do this was binding upon her independent of the treaty stipulation. Soulard v. U. S., 4 Pet. [29 U. S.] 512; Delassus v. U. S., 9 Pet. [34 U. S.] 133; Mitchel v. U. S., Id. 734; U. S. v. Moreno, 1 Wall. [68 U. S.] 404.

Under the provisional government the possessory right of Gervais would have terminated with his death, and his widow and children would not have succeeded him therein, for there was no transmission of possession or right from one occupant to another, but each settler "took up" his "claim," so to speak, de novo. If a settler came lawfully into the occupation of land once possessed by another he did not do so as the successor in interest of such other, but the one for a consideration or any cause abandoned the location, and the other took it up "as though the foot of man had never been upon it." Lownsdale v. Portland [Case No. 8,578]. And if this were otherwise the widow and children of Gervais could not have succeeded to his possession, for they, because of the sex of the one and the nonage of the others, were incapable of "holding a claim;" but the value of the "claim" and improvements would have been distributed among them by the intervention of an administrator and sale of the same.

Did the third article of the treaty of 1846 enhance this possessory right, or increase the quantity of the occupant's interest or the duration or time of its enjoyment? Does it contain a grant of some interest in or right to the possession of the soil, or is it merely a promise by the United States to respect an existing right, whatever that might be? On the one hand it is hardly probable that Great Britain, while conceding so much as she did to the United States by that treaty, would also surrender her subjects, who had settled here upon the faith of her claim to the country, without taking some sufficient security or stipulation as to their possessions, upon which many of them had spent years of labor and care to make permanent homes for themselves and families. The possessory rights of the Hudson's Bay Company provided for in the same article were of no higher character and hardly as meritorious as those of these British subjects. Yet the two governments, by the convention of July 1, 1863 (U. S. Pub. Treat. 346), declared that it was desirable that all questions concerning "the possessory

rights" of said company should be settled by the transfer of the same to the government of the United States for an adequate money consideration, and provided for an arbitration to ascertain the value thereof, upon which four hundred and fifty thousand dollars was awarded to the company.

Yet the language used in the treaty—possessory rights shall be respected—does not of itself indicate that any new or additional right was intended to be conferred thereby, but only that the existing right of possession, as defined by the local law should be respected, regarded, not infringed or denied without due process of law. Upon its face the stipulation appears to be a mere promise, which of itself confers no right to or in the soil, and for the neglect or violation of which the British subject would only have a just claim against the United States for compensation in money or kind. The legal power of the government to dispose of the territory south of the forty-ninth parallel as it saw proper was not limited by the treaty, and belonged to it thereafter as an incident of its sovereignty. The possessory right that it bound itself to respect was probably only that which the British subject then enjoyed under the local law, which practically terminated with his life. In Cowenia v. Hannah, supra, Mr. Justice Boise says: "The treaty of 1846 treated these lands as they then were; and had the parties intended to raise these possessory rights to a higher title, it would have been so provided. I think these possessory rights should cease on being abandoned, so that the possessor became disseised by his own voluntary failure to occupy; or, on his death, as such rights could not descend to heirs."

Yet, it is probable that justice required that the United States should have shown the same respect to the possessory rights of British subjects that it did to those of its own citizens in like circumstances. By section 4 of the donation act (September 27, 1850), the possessory rights of the American citizens then in the territory were confirmed to them in perpetuity. It is also true that all aliens having such possessory rights were entitled by the act to the benefit of this grant; but this was upon the condition that they should first become American citizens. Probably, by much the larger portion of the British subjects having possessory rights in the territory embraced this offer, and obtained title to the lands which they then occupied by becoming American citizens.

But this act, by means of which the United States first undertook to appropriate, dispose of, the territory—lands—south of the forty-ninth parallel, made no provision for ascertaining and protecting the possessory rights of British subjects, as such. In this respect it seems to have been framed in studied disregard of the treaty stipulation; except so far as the following proviso to said section 4 may have the effect to preserve them—

"that this section shall not be so construed as to allow those claiming rights under the treaty with Great Britain, relative to Oregon territory, to claim both under this grant and the treaty, but merely to secure them the election, and confine them to a single grant of land;" and this proviso to section 11 of said act arbitrarily appropriating—confiscating—the possessory right of Doctor John McLoughlin, a British subject, to the endowment of a university: "That nothing in this act contained, shall be so construed or executed, as in any way to destroy or affect any rights to land in said territory, holden or claimed under the provisions of the treaty or treaties existing between this country and Great Britain."

But, admitting that the possessory right guaranteed to a British subject by the treaty of 1846 amounted at most to a freehold or a right to occupy the land during the life of the settler, the question arises whether this proviso to section 4 does not have the effect to constitute it a grant of the land, the same as that made to American citizens or aliens who should become such. The proviso declares that it was not the intention of congress to allow a settler to claim under the act and the treaty both, but only to secure him the election to take a grant of land under either.

But the act made no provision for a British subject asserting a right to land under the treaty or otherwise, and therefore any one who did not submit to become an American citizen and claim under the act, as such, had no opportunity to give notice to the surveyor-general of his right or establish the facts constituting it. The result was that the right of an occupant was practically extinguished by his death, and those of his widow and children, if any were ignored. For instance, David Gervais, being born in Oregon of British subjects, while the territory was in the joint occupation of the United States and Great Britain under the treaty of 1818, was a British subject. McKay v. Campbell [Case No. 8,840]. At the date of the treaty of 1846 he was in the lawful occupation of six hundred and forty acres of land in the Oregon territory. By this treaty the United States agreed that in the future disposition of this magnificent domain his right to this land should be respected. By the act making such disposition, persons in his condition were recognized as being entitled to a grant of land, but no provision was made therein by which he or any one claiming under him could assert or establish his claim in the land department of the country. The consequence was that upon his death the land upon which he had lived for years, and upon which he may have expended the labor and savings of a life-time to provide a permanent home for his wife and children, was taken by the defendants, the De Havens, under the donation act, and acquired by them from the United States as a part of the pub-

lic domain. That this result is far short of what might have been expected from the justice, not to say the magnanimity, of a great nation in dealing with the rights of humble and helpless individuals over whom it had acquired jurisdiction upon the faith of a solemn pledge that it would respect such rights, will hardly be denied. But whether in this state of the law, the widow and children of Gervais succeeded to any rights which can be enforced as against these defendants in a judicial proceeding is a matter of which I have serious doubt.

Upon the whole my mind inclines to the conclusion that the treaty stipulation was not a grant, but a mere promise to respect an existing right of possession which strictly speaking amounted to no more than a freehold, or an estate for the life of the settler, and that the United States in disposing of the territory by the donation act, construed and recognized the right of the British subject to a grant for his possession the same as an American citizen, but provided no means and prescribed no mode in which such right could be asserted or established in the land department. But as this case can be satisfactorily disposed of upon another point made by the demurrer, it is not necessary to consider this question further.

The third and fourth causes of the demurrer are in effect that the alleged cause of suit is barred by the lapse of time because suit thereon was not commenced within the time limited by section 378 of the Oregon Civil Code, which, among other things, prescribes that no suit in equity "shall be maintained to set aside, cancel or annul, or otherwise affect a patent to lands issued by the United States * * * or to compel any person holding under such patent to convey the lands described therein, or any portion of them, to the plaintiff in such suit, or to hold the same in trust for or to the use and benefit of such plaintiff, for or on account of any matter, thing or transaction which was had, done, suffered or transpired prior to the date of such patent or within one year from the passage of this act."

The act referred to in this section was passed October 20, 1870 [Laws 1870, p. 23], and the patent to the defendant was issued on September 6, 1866. This suit was commenced in October 1, 1877, nearly six years after the time limited by this act, and more than eleven years after the date of the patent. The case falls within the purview of the statute. It is a suit to compel the defendants, holding under a patent from the United States to convey the lands described therein to the plaintiff on account of certain matters, to wit: the possession and occupation of Gervais, which transpired prior to the date of such patent.

While this section 378 is not binding upon this court sitting as a court of equity, it has been held to furnish a convenient and safe rule for its action in a similar case. Hall

v. Russell [Case No. 5,943]. In that case the court said: "An action at law to recover possession of this property would not be barred by the laws of this state under twenty years. Whether the court shall follow that statute or the limitation of five years, contained in section 378, supra, is the question. It is conceded that, in a case of equitable cognizance like this, the court is not bound by the statute of limitations, but may, for good reason, apply a longer or shorter time in bar of a suit. There is nothing in the circumstances of this case or the period fixed by the statute which requires the court to lengthen the term, but the contrary. * * * The patent was issued nearly ten years ago. * * * No reason is given for the delay; nor does it appear that the plaintiffs have been deceived or misled in any way by the defendants, or in anywise induced to forbear the assertion of their alleged rights. There never was any actual relation of trust or confidence between these parties. They claim under titles adverse in their origin, and have always occupied the attitude of adverse claimants. Under these circumstances, we think that the court ought to apply the shorter limitation of the two. Statutes of limitation are measures of public policy and expediency, and it is desirable that the rule should be the same in the national and state courts. We think in this case the court may safely adopt the limitation prescribed by the laws of the state in its courts in like case."

Whatever may be thought of the manner in which the United States has kept its engagement, to respect the right of Gervais to this land, there is no apparent reason why those who claim under him should not have sought redress in the courts before this. This has become a stale claim. There has been an unreasonable delay in asserting the right claimed. The case falls within the rule applied in Hall v. Russell, supra, and the bill must be dismissed.