ELLEN DOYLE v. SARAH ELIZABETH ANDIS, JOHN A. ANDIS, LIZZIE ANDIS, MARY B. JONES, MAGGIE E. DAVIS, Appellants.

**Deeds:** RULE IN SHELLEY'S CASE. The rule in Shelley's Case is a part of the common law of this State. Under this rule a deed to the grantee "during his natural life, and then to his heirs" conveys to the grantee the fee simple title. Justices Weaver and Sherwin dissenting.

*Appeal from Tama District Court.*— HON. G. W. BURNHAM, Judge.

FRIDAY, JANUARY 20, 1905.

ACTION to quiet title. A demurrer to the petition was overruled, and, defendants having elected to stand on the ruling, decree was entered as prayed. The defendants appeal. — *Affirmed.*

*Willett & Willett* and *Marsh & Cook,* for appellants.

*Struble & Stiger,* for appellee.

LADD, J.— In the year 1862 Robert P. Andis conveyed the land in controversy to Samuel S. Andis " during his natural life and then to his heirs." Subsequently the grantee named transferred the land by warranty deed to another, under whom the plaintiff through mesne conveyances holds title. Samuel S. Andis died in 1899, and the defendants are his heirs at law. To the petition, stating the foregoing facts and asking that title be quieted in plaintiff, a general demurrer was interposed and submitted to the court on the theory that, while the language of the deed to Samuel S. Andis brings it within the rule in Shelley's Case, that rule does not obtain in this state. It was overruled.

Many definitions of that rule have been given. That adopted by Chancellor Kent is generally regarded as both accurate and comprehensive: " When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there is a limita· tion by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs or heirs of his body, as a class of persons, to take in succession, from generation to generation, the limitation ,to the heirs entitles the ancestor to the whole estate." Preston on Estates, 263. Analyzing this definition somewhat, it appears that (1) there must be an estate of freehold in the first taker; (2) the estate in freehold and in remainder must be created by the same instrument; (3) these estates must be of the same nature, both legal or both equitable; (4) the word " heirs " or other words equivalent in meaning, is essential to the limitation over in order to create an estate in fee simple; and (5) the limitation must be to the heirs of him who first takes the freehold. The estate for life, created in the first donee, must be limited precisely as it would descend at law, in order to vest the fee.

Little difficulty has been experienced in determining the sufficiency of the estate of an ancestor. It may be for the life of the devisee or grantee, or of another person, or of the joint lives of several persons, and may be absolute or determinable on contingency, and may arise by express devise or necessary implication of law. 2 Jarman on Wills, 1181.

The trouble has arisen in ascertaining whether the words employed in the instrument in disposing of the remainder are words of limitation (that is, measuring the duration and defining the extent of the estate of the taker of the freehold), or words of purchase (that is, pointing out and designating the objects of the conveyance or gift of the remainder to whom it passes directly from the grantor or devisor). Mr. Hays, in his famous essay on the " Construction of Limitations to Heirs," adds another division, that of words descriptive of individuals, and then explains the three:

First, as words of limitation, their office is to measure the duration and mark out the devolution of the ancestor's estate. Thus, if land be given to A. and the heirs of his body, the word " heirs " is a word of limitation, because it is merely subservient to the purpose of ascertaining the force and direction in point of transmission of a gift made originally to A., who, as the sole object and motive of bounty, first attracted and absorbed the entire quantity of an estate not otherwise destined to benefit his heirs than as, in the way of the law, they were included in himself. Secondly, as words of purchase, they at once indicate the objects and limit the scope of the gift. Thus, if land be given to the heirs of the body of A., the word " heirs " is a word of purchase, because the heirs are themselves the original objects of the gift; yet the word " heirs " is not satisfied by the person or persons first answering the description of heirs or coheirs, but is of equal capacity with the same word used as a word of limitation. So, if land be given to A. for life, with remainder to the heirs of his body, the intention is manifest to use the word " heirs " as a word of purchase, and not of limitation. In order to determine whether the word " heirs " is meant to be a word of limitation or of purchase, according to the above exposition of those terms, we have only

to ask whether it is adjected as an incident to a gift made
to the ancestor; or used as the substantive term of an in-
dependent disposition.   Where the ancestor is dead, or no
estate is given to him, or an estate is by other words expressly
limited to him (as in the case put at the close of the preced-
ing paragraph), the word " heirs " must always be designed
to confer a distinct benefit on persons sustaining that char-
acter, and consequently to operate as a word of purchase.
It is obvious that this cannot be the point on which learning
and ingenuity have exhausted their powers, although, from
the language of the disputants, the subject of contention
would appear to be whether the word " heirs " was to be con-
strued a word of limitation or of purchase.   Thirdly, the
words in question, when used as descriptive of individuals,
are wholly deprived of their natural energy, and sink down
to the level of " children," etc.,   .   .   .   in which predica-
ment no greater potency can be attributed to them than be-
longs to the terms with which they are now associated.   They
ascertain the objects, but in ascertaining the objects their
force is entirely spent.   The nature and extent of the estate
to be taken must be sought for in the context, or, if that be
wanting or be silent, in the implication of law.   They can-
not be more operative than the terms which they represent,
and whose operation, as we have already seen, is simply to
describe a class of individuals.

Mr. Hargrave, said to be the most lucid expounder of
the rule, has discriminated clearly between conditions when
the rule ought and ought not to be applied :

When it is once settled that the donor or testator has
used words of inheritance according to their legal import,
has employed them intentionally to compromise the whole
line of heirs to the tenant for life, and has really made him
the terminus or ancestor by reference to whom the succession
is to be regulated, then it will appear that, being considered
according to those rules of policy from which it originated,
it is perfectly immaterial whether the testator (or donor)
meant to avoid the rule or not, and that to apply it, and to
declare the words of inheritance to be words of limitation,
vesting the inheritance in the tenant for life, as the ancestor
and terminus to the heirs, is a mere matter of course.   But,
on the other hand, if the words of inheritance were not used

in their full and proper sense, so as to include the whole inheritable blood, and make the tenant for life the ancestor or terminus for the heirs, but the testator intended to use the word "heirs" in a limited, restrictive, untechnical sense, and to point at such individual person as should be the heir, etc., of the tenant for life at his decease, and give a distinct estate of freehold to such single heir, and to make his or her estate of freehold the groundwork for a succession of heirs, and constitute him or her the ancestor terminus and stock for the succession to take its course from, in every one of these cases the premises are wanting upon which only the rule in Shelley's Case interposes its authority, and that rule becomes quite extraneous matter. So, then, in order to ascertain, in every case, whether or not the rule is applicable, the inquiry simply is, in what sense did the testator or donor use the words? If in the former sense, the rule always applies, notwithstanding a' positive declaration that it shall not. If in the latter sense, the rule is as invariably foreign to the case, the remainder is contingent until the death of the tenant for life, and the party named as heir takes by purchase. 1 Hargrave's Law Tracts, 575, 577.

Enough has been said to recall the nature and operation of the rule. Even this much has seemed unnecessary, in view of its commanding place in the law of real property. No rule of the common law has undergone the exhaustive investigation, thorough discussion, and severe criticism to which the rule in Shelley's Case has been subjected; and yet it has survived nearly 600 years of controversy in England, and has been generally accepted by the courts of this country as a part of that rich inheritance of common law upon which our jurisprudence is founded. No one now pretends to fix the date of its origin. The conditions for which it was intended to operate as a remedy are mere matters of conjecture. Some have thought that it was devised in feudal times to give the lord his profits of tenure (either wardship or relief) upon the descent to the heirs, of which he would be deprived were the remainder to pass to the heirs as purchasers; but Sir William Blackstone in *Perrin v. Blake,* 4

Burr 2579 (10 Eng. R. Cases 689), declares, that of this he has never met with a single trace in any feudal writer, and then adds:

There is hardly an ancient rule of real property but what has in it more or less of a feudal tincture. The common-law maxim of descent, the conveyancing by livery of seisin, the whole doctrine of copyholds, and a hundred other instances that might be given, are plainly the offspring of the feudal system; but, whatever their parentage was, they are now adopted by the common law of England, incorporated into its body, and so interwoven with its policy that no court of justice in this kingdom has either the power or (I trust) the inclination to disturb them.

In the same opinion he expressed the belief that the rule was first established to obviate the mischief of too frequently putting the inheritance in abeyance or suspense, and that it was founded somewhat upon " a desire to facilitate the alienation of land, and to throw it into the track of commerce, one generation sooner, by vesting the inheritance in the ancestor, than if he continued as a tenant for life and the heir was declared a purchaser." Mr. Hargrave, in his celebrated Tracts, suggests still another reason: That the rule in Shelley's Case is a part of an ancient policy of the law to guard against the creation of estates of inheritance with qualities, incidents, and restrictions foreign in their nature, and to preserve the marked distinction between the acquisition of a title by descent and by purchase, and to prevent the former from being stripped of its proper incidents and disguised with the qualities of the latter, whereby the estate would become a compound of descent and purchase — an amphibious species of inheritance or freehold, with unlimited succession to the heirs without the properties of inheritance. Hargrave's Law Tracts, 489, 551.

Certain it is that the power of alienation and that of vested estates were favored doctrines of the common law, and as such were promoted by the rule in Shelley's Case. If

of feudal origin, its purpose must have been to defeat in part the feudal policy that every grantee or devisee should take his estate *per forma doni,* the terms of which were to be construed *stricti juris,* in conformity with the idea of the ancient Roman law, contained in the Twelve Tables, by which a man, in conveying an estate to another, created all his rights by the terms of the conveyance. All estates were regarded, under the feudal system, as mere gifts or concessions on the part of the lords or barons to their vassals, and in the centuries it held sway and as a result of this policy many of the tenures became extremely burdensome, combining, as has been well said, the strangest comminglings of liberty and oppression to be found in any age.

In irrepressible conflict with these conditions was the common law, favoring the fullest investigation and ample in its elasticity to devise a remedy for every wrong. In the necessities of those times, for a principle which would unfetter these estates and defeat the indeterminate tenures, the rule in Shelley's Case may have originated. It was applied as early as A. D. 1325, in a case cited in Perrin v. Blake, and Lord Coke, in the margin of his Commentaries on Littleton, refers to numerous decisions in the Year Books of Edward III, which, in the words of Blackstone, " do most explicitly warrant the doctrine extracted from them by that great and learned judge." Though the principle had long been recognized, it appears not to have attracted general attention until A. D. 1590, when definitely stated by Lord Coke in the case from which its name is derived. 1 Coke, 93b. The discussion then became " so vehement and so protracted," according to the celebrated requiem of Chancellor Kent, " as to rouse the specter of haughty Elizabeth." The agitation then seems to have subsided somewhat for nearly one hundred years, when it was again awakened in 1770 by *Perrin v. Blake.* That case arose in Jamaica, and was brought before the Privy Council of England at a time when Lord Mansfield was the only law lord who attended. He

deemed the question involved of too great importance to be decided by his single opinion, and a feigned case was prepared and submitted to the King's Bench.  After being twice argued three of the judges, including Mansfield, agreeing that the case was within the rule in Shelley's Case, were for repudiating it, while one, Yeates, was for applying it. A fierce controversy arose.  Pamphlets were written assailing and in defense of Lord Mansfield, one of those in his behalf evoking a bitter reply from Mr. Fearne, author of the great work on Remainders, and Junius, in his envenomed letters, accused him of attempting to subvert the laws of England.  It is said by Lord Campbell in the " Life of Chief Justices " that the bar of the entire kingdom was divided into factions for several years, known as " Shelleyites " and " Anti-Shelleyites."  An appeal was taken to the Exchequer Chamber, where, after being several times argued, seven of the justices, including Sir William Blackstone, sustained and applied the rule, and one, Chief Justice De Gray, concurred in the views of Lord Mansfield.  That decision was followed by *Jesson v. Wright,* 2 Bl. 1, (10 Eng. R. Cases, 714), decided shortly afterwards, which has since been regarded as confirming the rule as a part of the laws of England, though in *Roddy v. Fitzgerald,* 6 H. L. Cas. 823, determined as late as 1858, there were several dissenting opinions.  In *Jordan v. Adams,* 9 C. B. (J. Scott) N. S. Rep. 483, it was severely criticised by Justice Cockburn, but adhered to as a rule of property.

We have briefly referred to the history of the rule as tending to answer the contention now urged that it ought to be rejected as likely to result in defeating the intention of the testator or grantor, and because not in harmony with the spirit of our institutions.  These questions were settled in England long after the period of the special usefulness of the rule in curtailing the wrongs of feudal tenures, or its alleged application for the protection of the lords and barons in their profits, had passed away.  Undoubtedly the doctrine

of *stare decisis* played an important part, but in the decisions and numerous pamphlets the merits were thoroughly discussed. Throughout the long controversy the argument most persistently urged was that it was out of harmony with the spirit of the laws of England, in that it tended to defeat the manifest intention of the instrument to which applied. If anything in the habits of our people or in the genius of our institutions essentially differentiates their situation from that of the English people in the time of *Perrin v. Blake,. Jesson v. Wright,* or *Roddy v. Filzgerald* in respect to this rule, it has not been called to our attention. Undoubtedly there are differences which bear somewhat upon the consequences of its application, but it may be safely asserted that there are none which have enlarged or re-enforced the objections in principle then pressed with such learning and skill. Will any one contend that it is not the policy of the law now, as in the days of Coke and Blackstone, to favor unfettered inheritances, the free alienation of property, and its subjection according to equitable liability to the debts of ancestors ? Is it not still the policy of the law that inheritances shall vest rather than be held in abeyance ? Do we not yet favor those incidents of estates in fee, that the widow be accorded her dower and the husband his curtesy ? Is there a single reason for rejecting the rule now and in this State that was not pressed by the great lawyers and jurists when it was finally imbedded in English jurisprudence as a part of the common law ? We have discovered none.

To the claim that it operated to defeat the intention, Blackstone responded in *Perrin v. Blake,* that

The misapprehension of a testator in thinking the remainders were contingent, when they were not so, cannot alter a rule of law. * * * The result of the whole matter is that, the testator having declared his intent that his son shall not alien his land, he to that extent gives his son an estate to which the law has annexed the power of alienation — an estate to himself for life, with remainder to the heirs of his body. Now, what is a court of justice to conclude from

hence ?   Not that a tenant in tail, thus circumstanced, shall be barred of the power of alienation.   This is contrary to. fundamental principles.   Not that the devise shall take a different estate from what the legal signification of the words impart.   This, without other explanatory words, is contrary to all rules of construction.   But plainly and simply this: that the testator has mistaken the law, and imagined that a tenant for life, with first interposed estate, and then a remainder to the heirs of his body, could not sell or dispose of this interest.

Fearne, in his work on Remainders, declared that " when a case arises fulfilling the requirements for the application of the rule, it is not against the intention of the testator. It is only applicable when the intention of the testator has been discerned by the ordinary canons of descent."   In *Jesson v. Wright,* Lord Redesdale said:   " That the general intent should override the particular (as has been stated by Lord Eldon) is not the most accurate expression of the principle of the decision.   The rule is that technical words shall have their legal effect unless from subsequent or inconsistent words it is very clear that the testator meant otherwise." Lord Thurlow, in *Jones v. Morgan,* 1 Bro. C. 220, observed " that, if the donor meant that every other person who should be heir should take, he meant, what the law would not suffer him to do, to make the heir take as purchaser."

The same thought has been well expressed by Mr. Justice Elliott in the recent case of *Allen v. Craft,* 109 Ind. 476 (9 N. E. Rep. 919, 58 Am. Rep. 425) :   " It has seemed to many that there is a conflict between the rule declaring that the intention of the testator must govern and the rule in Shelley's Case; but this appearance of conflict fades away when it is brought clearly to mind that, when the word ' heirs ' is used as a word of limitation, it is treated as conclusively expressing the intention of the testator.   Where it appears that the word was so used, the law inexorably fixes the force and meaning of the instrument."   See *Leathers v. Gray,* 96 N. C. 548 (2 S. E. Rep. 455).   Even were

it to be conceded, that the intention is often defeated by the application of the rule, it is to be said that this is in harmony with the policy of the law, which forbids the testator to make a will or grantor a deed that will invest the first taker with a freehold and his heirs as purchaser with an estate in fee simple by way of a contingent remainder, and if such an estate is attempted the law will defeat it, be the intention ever so plainly expressed. In *Walker v. Vincent,* 19 Pa. ·369, the court correctly says:

The law does not pretend to carry out the intention of the testators in all cases; for many testators show a very clear intention to shackle the estates granted by them to a degree that is totally incompatible with any real enjoyment of them, and which the law does not allow. Hence many rules of law are designed to control and frustrate the most manifest intent. The great merit of the rule in Shelley's Case is that it frustrates and is intended to frustrate unreasonable restrictions on titles; for, when an estate is declared to be a fee simple or fee tail, it is at once made subject to a limitation in its proper form, no matter how clear may be the testator's intention to the contrary.

The objections to the rule have been based largely on sentiment, and few, if any, cases of actual hardship will be found in the books. Planting themselves on the premises that its operation worked the defeat of the real intention of the grantor or testator, as expressed in the conveyance or will, its detractors have assailed it with vituperation and invective, forgetting that numerous other rules of real estate law, accepted without question, have precisely the same effect, and that the intention, to be effective, must be consistent with the rules of law. A man cannot by will create a perpetuity, nor could he put a freehold in abeyance at the common law, nor can he limit a fee with a fee, nor make a chattel descend to heirs, no matter how clearly his intention to do so be expressed. See *Carr v. Porter,* 1 McCord, Eq. 60.

It is denounced as an anachronism handed down from the feudal ages, but this criticism applies as well to many of the most cherished principles of the common law. Again, it is said that men ignorant of the rule may, in preparing wills or deeds, unintentionally employ language which will compel its application. Such persons are quite as likely to overlook the forms prescribed for the execution of such instruments, and thereby defeat the purposes of the testator or grantor, and yet no one has demanded that the statutes prescribing these shall be repealed. So, too, language is often incorporated in a will, possibly in ignorance of the accepted canons of construction, which this court has deemed itself bound to follow, notwithstanding the protests that the testator must have intended otherwise. *Law v. Douglass,* 107 Iowa, 606; *Hambel v. Hambel,* 109 Iowa, 459; *Meyer v. Weiler* 121 Iowa, 51. If courts have entertained contradictory views on the applicability of the rule, the same may be said of many others. That a principle is difficult of application has never been regarded as furnishing a sound reason for rejecting it entirely. As an illustration, see *Archer v. Jacobs,* 125 Iowa, 467. Other rules might have proven quite as satisfactory as those of the common law, and equally as well or better adapted to the administration of justice. It may be that the oncoming years will demonstrate much of our system to have been crude and imperfect. But the duty of this court is to administer law as found, and, even though it be confident of possessing the wisdom essential to successfully reform and improve many of its rules, the Constitution has conferred the authority so to do upon another branch of government. It is true the common law was adopted only in so far " as applicable to the habits and conditions of our society, and in harmony with the genius, spirit, and objects of our institutions." This does not mean that every rule must be subjected to the peculiar test, whether it is better suited than some other to our situation, but whether differences between conditions here and

in England render it inapplicable. Thus in *Wagner v. Bissell,* 3 Iowa, 396, the common-law rule requiring every man to keep his cattle within his close, which was necessary in a thickly settled country, was declared in 1856 not to obtain here as against a universal custom to allow cattle to roam at large over the unsettled prairies. And in *Pierson v. Lane,* 60 Iowa, 60, the statute *de donis* was denounced as inimicable to the genius and spirit of our institutions in that " its object was to place restraints upon alienation and create perpetuities for the purpose of maintaining a landed aristocracy." It ran counter to the policy of our government, and for that reason was rejected. The reverse must be true of the rule in Shelley's Case; for its object, as said in *Kiene v. Gmehle,* 85 Iowa, 312, was " to prevent the tying up of estates in land, so as to withhold them from alienation for long periods of time." As remarked before, if there is anything in our situation which renders this rule less appropriate to our situation than it was to that of the English people at the time of the severance of the two countries, we have been unable to discover it. Merely the existence of an aristocracy there is not alone enough; otherwise, the common law in its entirety must be rejected.

In *Hileman v. Bouslaugh,* 13 Pa. 344 (53 Am Dec. 474), Chief Justice Gibson protested that

The rule in Shelley's Case ill deserves the epithets bestowed on it in the argument. Though of feudal origin, it is not a relic of barbarism, or a part of the rubbish of the Dark Ages. It is a part of a system; an artificial one, it is true, but still a system, and a complete one. The use of it while fiefs were predominant was to secure the fruits of the tenure, by preventing the ancestor from passing the estate to the heir as a purchaser through a chasm in the descent, disincumbered of the burdens incident to it as an inheritance; but Mr. Hargrave, Mr. Justice Blackstone, Mr. Fearne, Chief Baron Gilbert, Lord Chancellor Parker, and Lord Mansfield ascribed it to the concomitant objects of more or less value at this day, among them the unfettering

of estates, by vesting the inheritance in the ancestor, and making it alienable a generation sooner than it otherwise would be. However that may be, it happily falls in with the current of our policy. By turning a limitation for life, with remainder to heirs of body, into an estate tail, it is the hand-maid, not only of Taltarum's Case, but of our statute barring entails by a deed acknowledged in court, and where the limi-tation is to heirs in general it cuts off what would otherwise be a contingent remainder, destructible only by a common recovery. In a masterly disquisition on the principles of expounding dispositions of real estate, Mr. Hays, who has sounded the profoundest depths of the subject, is by no means clear that the rule ought to be abolished even by Legislature; and Mr. Hargrave shows in one of his Tracts, that to ingraft purchase on descent would produce an am-phibious species of inheritance, and confound a settled dis-tinction in the law of estates. It is admitted that the rule subverts a particular intention in perhaps every instance; for, as was said in *Roe v. Bedford*, 4 Maule & S. 363, it is proof even against an express declaration that the heirs shall take as purchasers. But it is an intention which the law cannot indulge with the testator's general plan, and which is necessarily subordinate to it. It is an intention to create an inalienable estate tail in the first donee, and to invert the rule of interpretation, by making the general intention subservient to the particular one. A donor is no more com-petent to make tenancy for life a source of inheritable suc-cession than he is competent to create a perpetuity or a new canon of descent. The rule is too intimately connected with the doctrines of estates to be separated from it without breaking the ligaments of property.

And in *Polk v. Faris*, 9 Yerg. 209 (30 Am. Dec. 400), Mr. Justice Reese, for the Supreme Court of Tennessee, de-clared that

, Whatever may have been the origin of the rule, or how well soever it may seem adapted to attain the selfish objects or gratify the grasping cupidity of the feudal lord, it hap-pens to have been obviously based also upon principles of public policies and commercial convenience sufficiently broad and deep to cause it to survive for the period of near five

hundred years the rage of legislative innovation and all changes and fluctuations of the most eventful era of the world, and still to challenge the willing obedience and en-lightened support of most able minds of Great Britain and the United States. It is a rule or canon of property, which, so far from being at war with the genius of our institutions or with the liberal and commercial spirit of the age, which alike abhor the locking up and rendering inalienable real estate and other property, seems to be in perfect harmony with both. It is owing, perhaps, to this circumstance that the rule, a Gothic column found among the remains of feudality, has been preserved in all its strength to aid in sus-taining the fabric in the modern social system.

That the evils thereof are more imaginary than real is apparent from the fact that this court has up to the present time avoided the necessity of saying whether it should be recognized as a part of the common law of this State. It was first mentioned in *Zuver v. Lyons*, 40 Iowa, 510, and held not to apply, for that the ancestor had taken a trust estate and the heirs the legal estate, and the two could not unite in an estate of inheritance. In *Hanna v. Hawes*, 45 Iowa, 437, the rule was held " not to be applicable, because the testator did not vest the legal estate in Mrs. Little with a limitation over to the heirs of her body." The conveyance was by an executor, and was subject to restrictions in the will that at her death the property was " to go to the heirs of her body, and, if none, to be divided equally between the surviving children of her mother." Manifestly by " heirs of her body " was meant her children as such, and not heirs generally. In *Slemmer v. Crampton*, 50 Iowa, 303, the devise was to Maria A. Avery, " to be used, occupied, and enjoyed by her after she becomes of the age of legal majority, during her natural life only; * * * and it is my fur-ther will that after the death of my daughter Maria said lands and lot shall go to the heirs of her body free and clear of all liens and incumbrances thereon." The rule was held not to apply, for that the testator " intended the heirs to be

the root of a new descent, and the nomination of heirs of the body was merely description of the persons who were intended to take." As even the use and enjoyment did not pass in *præsenti* upon testator's death, much may be said in support of the construction that the devise was directly to the " heirs of her body " as a class. See *De Vaughn v. Hutchinson*, 165 U. S. 566 (17 Sup. Ct. 461, 41 L. Ed. 827) ; *Horne v. Lyeth*, 4 Har. & J. 435. While the rule was invoked in *Pierson v. Lane*, 60 Iowa, 60, the court held that it had no application where the first taker took the fee simple as a fee tail, as in that case. The conveyance was " to Minerva Pierson and the heirs of her body begotten by her present husband, George W. Pierson." This was held to be a conditional fee, not effected by the statute *de donis*, which was declared to be inimicable to the genius and policy of our institutions and to have been converted into a fee absolute by the birth of the requisite heirs. The remark in *Broliar v. Marquis*, 80 Iowa, 49, that the rule was applied in the above case, was evidently inadvertent. In *Kiene v. Gmehle*, 85 Iowa, 312, the devise to Emilie, daughter of the testator, was of a life estate, with the remainder over to her children. True, it was " to descend and vest in such heirs of her body begotten, in fee simple." The condition, however, was annexed that, if she die without heirs of her body begotten, the estate was to " descend and vest in equal parts to the heirs at law of the said testators," and the case was ruled by *Hanna v. Hawes, supra*. The opinion is somewhat inconsistent, for that in one portion it apparently treats the rule as one of construction, and in another as emphatically declared it a rule of property. The latter seems to have been the final conclusion, as the writer, in stating the reasons of the rule, observed:  " It is to prevent the tying up of estates in land, so as to withhold them from alienation for long periods of time. If the intention of the donor or devisor is within the provision of this statute or the rule in Shelley's Case, it is not sanctioned by the law and will not

be given effect, but, if otherwise, it will." Again quoting approvingly from *Hileman v. Bouslaugh,* 13 Pa. 351 (53 Am. Dec. 474), " the ascertainment is left to the ordinary rules of construction peculiar to wills; but, when the intention thus ascertained is found to be within the rule, there is but one way. It admits of no exception." As it has been regarded as a rule of property for more than 500 years, a contrary view ought not to be imputed to the writer of the opinion. The rather should the criticism of authorities holding the rule " independent of the intention of the donor or devisor " as " not sanctioned by reason of the current of adjudicated cases " be thought to refer to animadversions of the rule as not being in harmony with the intention; for that, when language within the rule is employed, it is conclusively presumed to express the donor's or grantor's intention. The devise construed in *Zavitz v. Preston,* 96 Iowa, 52, was, after the first taker, " to go and be equally divided between his lawful heirs and next of kin," and manifestly, because of such division, was not within the rule. In *Wescott v. Binford,* 104 Iowa, 645, the devise was to Hannah Wescott for life, and upon her death the property was to be divided between testator's three children, William Edwin Wescott taking the east third of the lot " during the term of their natural lives," but without power to convey " for a longer period than during their natural lives, respectively." At death their respective portions were to descend to their heirs, respectively, said heirs to have absolute title to their respective portions. The authorities were reviewed, and the conclusion reached that ." it cannot be said that they show that it has been adopted or should be enforced in this State," and, later, that " we do not find it necessary to determine whether the rule in Shelley's Case is in force in this State, but hold that, if it be in force, it cannot defeat the intent of the testator as expressed by the language of the will." The conclusion that the language of the will did not bring it within the rule in Shelley's Case is undoubtedly correct,

but might well have been put on another ground. See *Brown v. Brown,* 125 Iowa, 218; *Myers v. Anderson,* 47 Am. Dec. 537; *McIntyre v. McIntyre,* 16 S. C. 290. The case is authority, then, on two propositions only: (1) That the rule had never been recognized as in force in this State; and (2) that the language of the will did not bring it within the rule. The court did not undertake to pass upon the question now before us, and it may be regarded as *res integra.*

In the courts of last resort of twenty-five States the rule in Shelley's Case has been adjudged a part of the common law and enforceable as such. See article in 25 Am. & Eng. Enc. of Law, 639 *et seq.* In but one has it been declared merely a rule of construction. *Smith v. Hastings,* 29 Vt. 240. Mistakes of this character in other States have been corrected by subsequent decisions. Maine was severed from Massachusetts after the abolition of the rule, and for this reason it does not obtain in the former State. In but one, Kentucky, has it been held to be out of harmony with the institutions of this country. *Turman v. While's Heirs,* 14 B. Mon. 560. The very fact that it has been abolished in whole or in part in twenty-seven States is strong confirmation that it was thought not to have been so inconsistent with the conditions existing as not to have been adopted as a part of the common law. For centuries it has been recognized as a rule of property, and ought not now to be swept away.

"To disregard rules of interpretation sanctioned by successive ages and by the decisions of the most enlightened courts, under pretense that the reason of the rule no longer exists or that the rule itself is unreasonable, would not only prostrate the great landmark of property, but would introduce a latitude of construction boundless in its range and pernicious in its consequences." *Horne v. Lyeth,* 4 Har. & J. 432.— *Affirmed.*

WEAVER, J. (dissenting). For the reasons herein stated I cannot concur in the foregoing opinion:

I.   The rule in Shelley's Case has never been recognized or enforced in this State.   As the opinion concedes this to be true, and that the citation which has sometimes been made of *Pierson v. Lane,* 60 Iowa, 60, and one or two other cases, as sustaining the rule, is an error, I need take no time to demonstrate the correctness of this proposition.

II.   It has been expressly condemned and repudiated by this court.   To make this clear beyond cavil let us first illustrate the substance and effect of the rule in its practical operation.   In a vast majority of cases it is applied to a will or conveyance of land in which the owner attempts to give or devise a life estate to a named beneficiary, with a remainder in fee to the heirs of such life tenant.   Under such state of facts the rule in Shelley's Case steps in to say that the remainder given to the heirs must be defeated, and that he who was given a life estate only shall be vested with the entire fee.   Bearing this distinctive feature of the rule in mind, a brief reference to our decisions will demonstrate the correctness of my assertion that we have again and again distinctly denied its force as a rule of property in this State. In *Slemmer v. Crampton,* 50 Iowa, 302, we held that a devise of lands to A. during her natural life only, and after her death to her heirs, should be construed to mean just what it said, and that A. took nothing more than the life estate, which it was clearly intended she should have.   This holding was in clear disregard of the rule in Shelley's Case according to every approved statement of its effect. 1 Preston's Estates, 363; 2 Washburn Real Property (6th Ed.) section 1613; *Hileman v. Bonslaugh,* 53 Am. Dec. 475; *Roe v. Bedford,* 5 Gray, 99.   In *Kiene v. Gmehle,* 85 Iowa, 312, we have another and more emphatic ruling in the same direction.   There the devise of lands was to Emilie Mack for life, and at her death to descend to her heirs in fee simple. This made a clear case for the application of the rule, if it was to be recognized in this State, and the claimants under Mrs. Mack insisted upon its benefit; but we said that, if

Shelley's Case was to be recognized as an authority at all, it would be treated as a rule of construction only, and that, where the intent to pass merely a life estate to the first taker is clear, it must prevail. In this connection we spoke as follows of the general principle, which has never been repudiated by this court until the accomplishment of that result by the majority opinion in the present case: " Courts may not give effect to any other result than that intended. To do so would be to make a will for the testator. Neither may they defeat the intention when it is lawful. There are some respectable authorities that hold the rule in Shelley's Case is independent of the intention of the donor or devisor; that it is absolute and imperative. Such application of the rule is not sanctioned by reason or the current of adjudicated cases in this country." Again in *Zavitz v. Preston,* 96 Iowa, 52, we said: " Whether the rule in Shelley's Case is in force in this State we need not determine. It certainly cannot be invoked to defeat the intent of the testator." So, too, in *Wescott v. Binford,* 104 Iowa, 645, we carefully reviewed all our previous cases bearing on the rule and announced the conclusion that it can " not be said of them that it has been adopted or should be enforced in this State." We further said that to give the word " heirs " a technical meaning, and thus frustrate the intention of the testator by giving the first taker a fee, instead of a life estate, " is not in harmony with the best rules of interpretation, nor with the weight of authority, nor to be founded in reason, nor to be demanded by anything in the letter or spirit of the laws of this State or the condition and policy of its people and their institutions. The conditions which the rule was designed to meet do not exist here, and to hold that it applied to the will under consideration would be to go counter to the rules of interpretation which this court has always applied, to overrule in effect many cases which we have decided, to some of which we have referred, and to establish a rule which has been so unjust in its operation as to be aban-

doned or modified by nearly all the States in which it was once in force." The opinion also combats the idea that the rule is one of property, and not of interpretation, and cites our cases to show that such doctrine is not favored in this State.

III. Save in a limited sense, the common law of England, by virtue of which alone the rule in Shelley's Case ever had being, has never been adopted in Iowa. In many, and perhaps most, of the States of the Union statutes were early enacted adopting the entire system of the common law as of the date of the first settlement of this country or of the date when we attained national independence. It has been necessary, therefore, for such States, in order to get rid of the rule in Shelley's Case and other débris from past ages and primitive conditions, to effect such purpose by statute. Iowa has never attempted any legislative adoption of the common law, and this court has steadily held that only so much of that system will be here recognized and enforced as is suitable to the habits and conditions of our society and in harmony with the genius and objects of our institutions. *Wagner v. Bissell,* 3 Iowa, 396; *Ex parte Holman,* 28 Iowa, 88; *Pierson v. Lane, supra.* Brought to this test, the rule in Shelley's Case must be condemned. In design and in practical effect it is wholly at variance with the spirit which pervades our Constitution, laws, and accepted social theories. I confess to some degree of surprise to find the majority twice repeating the suggestion that there is nothing " in the spirit or genius of our institutions which essentially differentiates them " from those of the English people at the time of our separation from the mother country. If such be the case, then the Revolutionary fathers should be called down from their pedestals and relegated to the list of conspirators against human rights. English institutions of that day were founded upon and permeated by the idea, not yet extinct, that a landed aristocracy is an essential order of society, to the preservation of which Parliament and the courts were

pledged; and the rule in Shelley's Case was unquestionably one of the devices conceived and framed as a means to that end. It served to prevent the subdivision and distribution of lands, and to cement their concentration in the hands of the few. The inability of the majority to discover any difference between such institutions and those of a people where the multiplication of land-owners is believed to be essential to the general welfare does not appear to have troubled the Supreme Court of the United States, which says that in England the rule in Shelley's Case " is in accordance with the established law of descent, the general sentiment of the people, their public policy, and the spirit of their institutions. It helps to conserve the power and splendor of the ruling classes by keeping property in the line of descent which the rule prescribes. Our policy is equality of descent and distribution. Such is the sentiment of our people and such is the spirit of our institutions." *Daniels v. Whartenby,* 84 U. S. 639 (21 L. Ed. 661).

If this opinion of the highest court of our land is correct, and it cannot be successfully denied, then Iowa's " ruling classes " will have occasion to felicitate themselves on the opportunity which we now give them to keep their lands " in the line of descent " and prevent undue encouragement of the plebeian classes to become independent proprietors. The easy facility with which in this case we are overturning our former decisions and abandoning principles which have long been well settled makes reference to the precedents of no avail; but I cannot refrain from saying that, while adopting and applying many of the cardinal principles of the common law of real property, we have hitherto refused to recognize the binding force of many rules invented by the English courts and lawyers to maintain the ascendency of the great proprietors. As a marked instance of this we may recall the entailment of lands at common law — a scheme by which the title was passed to a grantee or devisee and to the heirs of his body in direct line of descent, failing which

at any time, no matter how far in the future, the title reverted to the grantee. This device was just as firmly ingrafted upon English law as was the rule in Shelley's Case. The one is no more foreign to our institutions than the other. The States which adopted the common law by act of the Legislature bound themselves to both, and in most cases have since abolished both. Iowa has never abolished either by statute, and, if one is to be recognized, then for equally good (or bad) reasons we should give force to the other. Yet in *Pierson v. Lane, supra,* we found that the entailment of land titles is inconsistent with the theory upon which society is here founded and refused to give it effect. So we might proceed to enumerate an almost endless list of rules and so-called principles pertaining to real property and titles which no court thinks of enforcing, although no attempt has been made at their formal abolition. It has long been our boast that the common law is a ceaseless evolution, adapting itself to the changing conditions of successive generations. " It is not an unchangeable code, like that of the Medes and Persians, but a system that has grown up with the growth of our civilization and is capable of being molded to meet the wants of society in every stage of its progress." *Herter v. Mullen,* 159 N. Y. 34 (53 N. E. Rep. 700, 44 L. R. A. 703, 70 Am. St. Rep. 517). In *Mentzer v. Telegraph Co.,* 93 Iowa, 757, we adopted this sentiment, and added: " Should it [the common law] ever fail to be adjustable to new conditions, which age and experience bring, then its usefulness is over, and a new social compact must be entered into." If the truth there so eloquently and convincingly stated is now to be ignored, and our sanction given to the resurrection in all its ancient vigor of a rule which we have said was " designed to meet conditions which do not here exist," and is " so unjust in its practical operation " as to lead to its general abandonment, the tributes we have paid to the progressive character of the law should be frankly

withdrawn, and the terms of the new social compact have our serious consideration.

IV.  The rule has been abolished or become obsolete in a great majority of the States of the Union and in voluntarily adopting it at this late day we put ourselves out of harmony with the law as it exists in sister jurisdictions.  Of the forty-five States, twenty-seven have abolished the rule by statute, although in seven of them the abolition is held to apply to wills, and not to deeds.  In several of the new States the question of its existence has never been raised, and no statute abolishing it has been passed, these States evidently being satisfied that the rule is already extinct without the aid of legislative action.  This decision will bring to their attention the important truth that some forms of evil may go into " desuetude " for an indefinite length of time without becoming " innocuous."  In Vermont, not included in the foregoing classification, the rule has never been allowed as a rule of property.  *Smith v. Hastings,* 29 Vt. 240; *Blake v. Stone,* 27 Vt. 475.  The principal States in which the courts have notably recognized the rule are Pennsylvania, Maryland, Indiana, and Illinois, and in at least two of these it has been greatly encroached upon by decisions which have sought to relieve it of some of its admittedly harsh features. *McIlhinny v. McIlhinny,* 137 Ind. 411 (37 N. E. Rep. 147, 24 L. R. A. 489, 45 Am. St. Rep. 186); *Ridgeway v. Lanphear,* 99 Ind. 253; *Belslay v. Engel,* 107 Ill. 182.  Elliott, J., of the Indiana court, thus indicated his view of the rule: " Whatever reasons may once have existed for it in England have even there long since ceased, and no good reason is perceived for its incorporation into the legal policy of this country."  *Siceloff v. Redman's Adm'r,* 26 Ind. 251.  Mr. Freeman says that questions respecting the rule possess " more of historic interest than practical value."  Note to *Polk v. Faris,* 30 Am. Dec. 400.  The rule itself comes from an age of which Blackstone says:  " Its ingenuity perplexed all theology with the subtility of scholastic learning

and bewildered philosophy with its mazes of metaphysical jargon." The same singular tendency was manifested in the law of tenures, and there was built up a system of real estate law filled with nice distinctions and refined reasoning, the great body of which is at this time of as little living interest as are those ancient disputations concerning the number of angels which can comfortably stand upon the point of a needle. Most of these mystifying, doubt-breeding characteristics of English land tenures have disappeared with the darkness of the age in which they had their birth. Chancellor Kent's celebrated " requiem," of which the opinion speaks, was inspired by his discovery that even at that early date the rule in Shelley's Case had ceased to exist, and he calls his flowery eulogy upon its ancient defenders a " humble monument to departed learning." Does it not border upon sacrilege for us, who should be foremost in showing honor to the great Chancellor, to remove the monument which he so reverently erected and exhume that departed learning which he then laid to rest? The inquiry which the majority make, whether the " unfettering " of estates and the vesting of inheritances are not still the policy of the law, is wholly irrelevant to the question before us. When the law undertakes to say to the donor that his gift of a life estate to A. with remainder to his heirs, shall be defeated and distorted into a gift to A. of the entire fee, but that a life estate to A., with remainder to B. or to the children of B., will be respected and enforced, it is transparent folly to pretend that the result in the first instance is to be justified upon the assumption of some deep underlying purpose to hasten the " unfettering of estates." If a deed or will be obscure or ambiguous, and there is a manifest uncertainty whether the estate given was intended as a life estate or fee, then the supposed policy to which the inquiry refers may lead the court to decide in favor of the latter construction; but where there is no ambiguity there

is no policy of the law which inclines the courts to disregard
or defeat a clearly expressed intention.

    V.   The spirit of our laws and great body of our ad-
judicated cases sustain the proposition that the first duty
of the court is to ascertain the intent of the donor, and, if
that intent be lawful, to enforce it.  Now, a landowner has
an undoubted perfect legal right to give his property to A.
for life and to heirs of A. the remainder in fee; and this is
true, even where the rule in Shelley's Case prevails, provid-
ing only he makes use of a choice of words which avoids the
technical pitfalls which that rule spreads in his path.  Why,
then, in this one instance, should a lawful intent, clearly
expressed, be selected for defeat, when in all others we feel
religiously bound to effectuate it?  In all the infinite variety
of litigation arising from matters of contract and upon the
construction of written instruments through which title to
property is traced (save only as this rule creates an unnatural
exception), the intent of the parties to the writing is the one
aim of judicial inquiry.  To that end we have said, so re-
peatedly that citations are unnecessary, the entire writ-
ing will be considered, each part in light of all the others,
and the words will be given their popular meaning
or their technical signification according as it may ap-
pear they were intended to be understood.  The rule in
Shelley's Case strikes at the foundation of this principle and
foists upon the writing an interpretation wholly foreign to
the maker's purpose.  That such is the case is not seriously
denied by the majority.  They say, however, that, while it
does serve to defeat the " particular intent " of the donor,
it gives force to his " general intent."  Just what that phrase
means as here applied I am wholly unable to comprehend.
The donor expresses his intent to give to A. a life estate in
certain property, and after his death to the heirs of A. in
fee.  The " particular " intent is plain enough.  It is not
open to any doubt.  What hidden " general " intent can
be extracted from this provision, the accomplishment of

which makes it necessary to destroy the remainder given to
the heirs and give the fee to him from whom it was ex-
pressly withheld? Indeed, upon this point the majority
opinion yields all that the most strenuous opponent of the
rule may claim when it says that by its application " the
words in question are wholly deprived of their natural
energy." This sonorous euphemism, when duly studied,
will be seen to mean simply this: that the rule is designed,
not only to defeat the expressed intent, but to impose upon
the words of the donor a meaning utterly foreign to such in-
tent. In other words, it not only defeats the will or deed
made by the property owner, but proceeds to make for him
another, will or deed which never had the assent of his mind.
Such a proposition is not to be defended as a matter of prin-
ciple, nor should any court give effect thereto, unless required
by statute or by undoubted controlling precedent, neither
of which overruling circumstances confront us in this case.
The following from a report adopted by the State Bar Asso-
ciation of Pennsylvania, an organization which counts among
its members many great lawyers in a State where practical
experience has demonstrated the effect of the rule, is worthy
of much consideration.

That this rule always defeats the real intention of the
grantor or testator is freely admitted by every one. Of
what avail are the canons of construction? The words may
plainly show the intent, but they no longer have weight. It
matters not what hardships are inflicted, what injustice is
done, or how it may frustrate the plans of the testator, this
relic of barbarism is in supreme control, and its power will
continue until abridged by legislation. So long as this
imperious rule is permitted to hold sway, there will be un-
certainty as to the effect of grants and devises on this line,
and the result must be contention in the courts to ascertain
whether the intention of the testator falls under the guillotine
of that rule. Feudal tenures have long since been abolished.
We know them not in Pennsylvania, and why should we con-
tinue in force a rule which, as now enforced, every judge and
every court admits is antagonistic to and destructive of the

idea of allowing the owner free will in the disposition of his property.

Report Pa. State Bar Ass'n 1898, page 32.

VI. Though the rule claims origin so far back that its history cannot be precisely traced, and has been the object of indiscriminate, if not idolatrous, adulation upon part of its defenders, and although the cases in which the courts have struggled with it are numbered by the thousands, it is still so obscure in its statement and so difficult of apprehension that it has been and must be, wherever it prevails, a' more fruitful source of strife and litigation than any other one question affecting land titles. No clearer or more learned statement of the nature of the rule has been or can be made than is contained in the majority opinion, and when I say it constitutes a labyrinthine puzzle, in which the whole profession may enter and no two lawyers find the same exit, it casts no reflection upon those who formulated the statement, but simply demonstrates the inherent weakness and uncertainty of the proposition which they attempt to defend. The most skillful of the captive brickmakers in Egypt could not make bricks without straw, and the most expert legal dialectician who undertakes to clothe the rule in Shelley's Case with the varnish of plausibility finds himself confronted with a poverty of material compared with which the destitution of the oppressed Israelites was a wasteful abundance. If, then, in such case, they who enter the lists of apologists betake themselves to the thick mists of black-letter learning, it is not so much from choice as from the necessities of the position they have assumed. In that uncertainty is found one of the most persuasive reasons why, this State, thus far happily free from the perplexities which inevitably follow recognition of the rule, should not be subjected to its influence. The definitions of the principle by courts and law writers are numerous, varying only in the degree of obscurity in which they are clouded. The centuries of its history have been insufficient for its advocates to find common ground

on which to stand in its practical application, and the lawyer who sets out to discover the "weight of authority" upon many of its phases soon finds himself lost in an impenetrable forest of varying precedents and discordant opinions.

A few years since a young lawyer, seeking "more light" upon the subject, addressed a request to the American Law Review, then edited by Seymour D. Thompson and Leonard A. Jones, both eminent law writers, asking for "a plain, common sense, easy to be understood definition of the rule in Shelley's Case," and receive answer as follows: "Not having the capacity to understand the rule in Shelley's Case, or to acquire an understanding of it by any degree of diligence within the limits of a lifetime, we find ourselves unable to comply with the modest request of our esteemed correspondent." Lord Macnaghten says, in *Grutten v. Foxwell, supra,* that "learned writers on the subject are not agreed as to the mode in which the rule operates." Sir Edward Sugden despairingly declares that "no man can reconcile the decisions." *Montgomery v. Montgomery,* 3 J. & L. 47. In *Perrin v. Blake,* Mr. Justice Blackstone spoke of the rule as being flexible, and leaving some room for construction in accord with the manifest intent of the testator. After his death Lord Macnaghten (*Grutten v. Foxwell*) and Lord Thurlow (3 Jur. Ex. 363) were at much pains to explain that Blackstone did not really mean what he said, and that the rule is as inflexible and unyielding as the law of gravitation. 9 Washington Law Reporter 258, says that from the date of the engraftment of the rule upon the common law "it has been the source of perplexity to the courts and of endless annoyance to the bar, as well as absolute wrong to the testator and heirs, has perverted, changed, and abrogated the intention of donors, and thereby proved a Pandora's box of legal troubles and the destruction of the peace of families and the consumer of their estates." In Pennsylvania the rule has been adhered to from the early history of the State, and there, if anywhere, we should look

for the law to be settled.   An experienced lawyer of that
State, writing in 36 American Law Register 239, tabulates
not less than one hundred cases involving the rule, decided
by the Supreme Court of Pennsylvania, in which the same
words " heirs," " heirs of the body," " issue," " children,"
and other similar forms of expression have been construed
with such variant and contradictory results that he justly
declares that before a member of the profession undertakes
to draw a deed or will ·giving the first taker an estate for
life with remainder to his issue, heirs, or children (a per-
fectly legal method of conveying or transmitting title, if
one is fortunate enough to select the right form of words),
he should " stop, look, and ponder, for the beaten path is
treacherous."   After reviewing the cases, he comes to the
very just conclusion that, even after the lawyer has given
to the preparation of such instrument the best thought of
which he is capable, his confidence in its being construed
according to its intent must rest solely on the dubious hope
that the court will follow one line of its decisions rather
than the other.   This condition is typical of the state of
the case law of every jurisdiction where the rule has been
applied, and it fully justifies the same lawyer's summing
up:   " A rule of law may be gray with age, and therefore
venerable; but it may also be gray with mildew."   Mr.
Fearne, in his preface to his great work on Remainders, says
that " one of the greatest judges who ever lived tells us that
such is the number and character of the decisions on the
rule in Shelley's Case and its kindred topics that the mind
is overwhelmed by their multitude and the subtility of the
distinctions between them."   Judge Lyman P. Trumbull,
of national fame as a lawyer and statesman, says the rule
in Shelley's Case " has contributed more than all other causes
combined to defeat the wishes of persons who have attempted
to dispose of their estates by will," and characterizes it as
" a rule coming down from the Dark Ages and promulgated
by some judge in the case of one Shelley, declaring the word

' heirs ' a word of limitation and not of purchase, whatever that means. Where and for what purpose the rule was promulgated nobody exactly knows, and its meaning nobody except one learned in black-letter law understands, and it is doubtful if he does. To the common mind the rule is nonsense." 27 Am. Law Review, 321.

Let us note some of the intricacies in which the subject has become involved. While, according to the letter of the rule, a gift to A., with remainder to his heirs, will vest A. with the entire estate, and give the heirs nothing, yet it is held that, if the word " heirs " is found to have been used as the equivalent or synonym of " children," the donor's intent will prevail, and A. will take a life estate only. *Shimer v. Mann,* 99 Ind. 190 (50 Am. Rep. 82) ; *Criswell's Appeal,* 41 Pa. 288. So, too, it has often been held that a remainder over to the " child," or " children," or " issue," of the life tenant, will not enlarge the life tenancy into a fee. *Chambers v. Payne,* 59 N. C. 276. But let us beware. This avenue of escape is also beset with thorns. If, upon reading the instrument, the court thinks that you used the word " child," " children," or " issue " as the equivalent or synonym of " heirs," then the rule steps in to destroy the life estate you attempted to create, and gives the entire title to a person you did not intend should have it. 2 Flint, Real Property 128 ; *Robinson v. Robinson,* 1 Burr. 38 ; *Doe v. Davies,* 4 Barn. & Ad. 43 ; *Lee v. Mosley,* 1 G. & C, 539 ; *Roddy v. Fitzgerald,* 6 H. L. C. 823 ; *Simpers v. Simpers,* 15 Md. 160. So it has been held that if to the limitation to " heirs " there be added the words '" share and share alike," or other similar expressions, the rule may be avoided. *Mills v. Thorne,* 95 N. C. 362 (2 Minor's Inst. 404) ; *Shreve v. Shreve,* 43 Md. 382 ; *Mills v. Thorne,* 95 N. C. 362 ; *Taylor v. Cleary,* 29 Grat. 453 ; *Burgess v. Thompson,* 13 R. I. 712. Exactly the opposite conclusion has been reached by many other authorities. *De Vaughn v. Hutchinson,* 165 U. S. Rep. 566 (17 Supt. Ct. Rep. 461, 41 L. Ed. 827) ;

*Doe v. Cooper,* 1 East, 279; *Jesson v. Doe,* 2 Bligh, 1;
*Grimes v. Shirk,* 169 Pa. 83 (32 Atl. Rep. 113). A devise
to husband and wife for life, with remainder to their heirs,
falls within the rule. *Feely v. Moore,* 3 O. 465; *Auman v.
Auman,* 21 Pa. 343. A devise to a husband for life, with
remainder to his heirs by his present wife, falls without rule.
*Den v. Hobson,* 2 W. Bl. 693; *Verum v. Wright,* H. L.
C. 35.

Indeed, without threading this maze any further, and
we have here scarcely entered its border, we may say that
about the only method by which the donor can give a life
estate to another, with a remainder to the heirs of the donee,
and feel reasonably sure that his purpose will not be judically
thwarted, is to create the life estate and the remainder by
separate instruments; and this method is probably not open
to one who wishes to pass the estate by will, instead of by
deed. 1 Fearne, Remainders, 71; 1 Preston, Estates, 309;
*Moore v. Parker,* 1 Ld. Raym. 37; *Coale v. Arnold,* 31
Eng. L. & Eq. 133; 2 Washburn, Real Property (6th Ed.)
section 1605. It is but little short of the ludicrous to find
that this rule, to which its adherents have for ages invited
attention as the product of profound wisdom and as an in-
dispensable safeguard of property rights and promoter of
wise public policy, is, when reduced to its lowest terms, a
simple declaration that you shall not by a single written in-
strument do that which you may lawfully and effectually
accomplish by two. Every one of the fine distinctions by
which the rule is surrounded, and I have mentioned but a
mere fraction of them, is an open door to untold litigation.
There is not another doctrine connected with the law of real
estate which has been productive of so much strife, not an-
other which the courts have involved in such obscurity and
uncertainty, and not another of which it can be so truly
said that its application is invariably a triumph of in-
justice.

VII. The final argument of every apologist for that

rule is that it is intended to prevent the tying up of estates, and is therefore in accord with the general policy of our laws. A little reflection will reveal the fallacy of the argument. It is not the policy of our laws to restrict, invalidate, or discourage the creation of life estates. On the contrary, we have by express statute provided, not only that the property owner may suspend the power of sale for the lifetime of a person in being, but for twenty-one years thereafter. Neither has it ever been the policy of the common law to discourage or destroy life estates for the purpose of "removing clogs" upon the alienability of lands. During all the years since the rule in Shelley's Case came into being, the right to create life estates in almost every conceivable method (save only the one form at which that rule is aimed) has been recognized, upheld, and enforced by the courts with unvarying regularity. Thus it happens that, while forbidding the donor to give a life estate to A., with a remainder to A.'s heirs, he has been at perfect liberty to give a life estate to A., with remainder to the heirs of A.'s wife, or to the heirs of A.'s mother-in-law, or to the heirs of an entire stranger. The same common law permitted the piling of one life estate upon another in the most puzzling confusion. It created life estates for the benefit of the surviving wife, and husband, and for the tenant in tail after the possibility of issue has ceased. It construed every deed which omitted the magic word "heirs" as conveying a mere life estate. It upheld the entailment of estates and the law of primogeniture, and all the other elaborate and multifarious devices by which the alienability of lands was held in check and the estates of great families preserved, even at the expense of their creditors. In view of this history, the faith which can discover in the rule in Shelley's Case a benevolent design to facilitate transfers of title comes clearly within St. Paul's definition: "The substance of things hoped for; the evidence of things not seen." Even in England, with all its conservative adherence to the tradi-

tions of the law, the lawyers are ceasing to deceive them-
selves by this sort of sophistry.    In a recent paper read before
the Judicial Society of London, Sir George Bowyer says:
" The celebrated rule in Shelley's Case, which has caused
so much discussion, is based on feudal reasons which are now
obsolete."    Juridical Society Papers, 543.    So, also, in
most States in which the rule still prevails, the courts no
longer assert such defense of the rule, but candidly admit
it has no foundation in the present order of things.    If the
creation of life estates be inimical to the welfare or prosperity
of the people, it is within the power of the Legislature to regu-
late or prohibit them.    It has not done so, and the court is not
constituted the guardian of the people, with power to enact
rules of property which the law-making power does not see
fit to adopt.    On the contrary, the creation of a fee, the
enjoyment of which is postponed to the termination of a
life estate, being within the conceded power of the land-
owner, the court should feel in duty and in conscience bound
to protect its exercise, and not go out of its way to recall a
disused and discredited principle to defeat it.

VIII.    It is the just and appropriate tendency of the
laws of this country to promote simplicity of contract and the
easy creation and transfer of titles to property, and to ignore
the merely technical, wherever it is necessary to attain the
ends of substantial justice.    In England conveyancing is
or has been largely the work of skilled men constituting a
learned profession, and under such circumstances it is per-
haps a fair presumption that technical words are intended to
have a technical effect.    In this country, and especially in
the western States, the great majority of deeds and wills are
drawn or executed by others than lawyers or men having
expert knowledge of conveyancing.    Justices of the peace,
notaries, bank clerks, and sometimes clergymen and physi-
cians, prepare these instruments for their patrons and neigh-
bors.    The inherent ineradicable vice by which the rule in
Shelley's Case is differentiated from all our hitherto ac-

cepted rules of law is that it gives to words a meaning and effect diametrically opposed to their universally accepted meaning among the people, including people of education and experience who use and understand the English language, and thus creates a snare by which the average person, learned and unlearned, finds it impossible to express his intent, no matter how lucidly it be stated, with any certainty that it will be respected by the courts. The average grantor and most of the scriveners never heard of Shelley's Case. They have all heard the word "heirs," and know what it means in ordinary parlance, but have yet to discover that none but a veteran lawyer can write that word in a deed or will without danger of defeating the intention which to the ordinary mind has been expressed with the utmost clearness. For a well-to-do-person to desire to give a life estate in land to a child, with a remainder over to the offspring of such child, is a matter of everyday occurrence in almost every neighborhood. He has both the legal and moral right to thus fence against the weakness or misfortune of the child, and at the same time preserve the inheritance for the grandchildren. The statute which gives voice to the public policy of the State expressly permits him to suspend the absolute power of controlling and conveying the property for the period of a life in being and twenty-one years thereafter. Code, section 2901. His object is a laudable one, and, if carried into effect, tends to the public benefit, in that it insures the objects of his bounty against becoming public charges. Now, let us note the experience of the farmer or business man, who goes, as he is quite sure to do, to a nonprofessional conveyancer and asks to have prepared an instrument which shall secure certain property to his son for life, and after the son's death to his children or heirs absolutely. The conveyancer, rashly believing that, if he draws an instrument which states exactly what the father wishes to do, the law will uphold and enforce the clearly expressed intention, writes: "Know all men by

these presents, that I, A. B., in consideration of the love and affection I bear to my son, C. D., hereby grant and convey to the said C. D. the following described lands,   *   *   * to have and hold for and during the term of his natural life, and after the death of my said son to his heirs in fee simple." The father, having executed this instrument and put the son in possession, fondly supposes that his benevolent purpose is now assured.   But, if the rule in Shelley's Case is still the law of his jurisdiction, he may awake the next day to see that land seized and sold for the son's debt, or to see the son himself squander the entire inheritance in the nearest bucket shop or upon a horse race.   Too late he goes with his troubles to a lawyer, who, after dusting his Kent's Commentaries and making sure that he correctly remembers the rule, tells his client there is no hope.

It is true, he says, you intended to give your son a simple life estate in the land, and it is equaly true you stated that intention in so many plain English words; but unfortunately you gave the remainder after his death to his " heirs."   If, instead of this word, you had said " children," or " wife and children," or had described these persons by their individual names, or had made the heirs of a stranger, instead of your son, the objects of your bounty, the property might have been saved; but you failed to understand that it is sometimes a legal mistake to clearly express a legal intention.   Of course, these " children " will be " heirs " of your son if they survive him, and you supposed the terms to be convertible, but *nemo est hæres viventis*.   Having used that fatal word, the fact that every person of common sense and intelligence understands that you did not mean to give this land to your son absolutely, the fact that you had the unquestioned legal right to give him a life estate only, and the fact that you have expressed that intention with all the clearness and exactness of which our mother tongue is capable, all these things count as nothing, and the inheritance you designed for your helpless grandchildren must go to swell the list of offerings upon the altar of Shelley's Case.

If he is so constituted that the hall-mark of the Dark

Ages is a sufficient passport to his confidence, he will find food for comfort in learning that he has simply come in collision with " a Gothic column found among the remains of feudality," and in any event he will have cause to congratulate himself upon his narrow escape from the grave responsibility of " producing an amphibious species of inheritance."

The disposition which this man sought to make of his property was natural, commendable, and lawful. Why should the court make it unnecessarily difficult, and construct or adopt artificial and oppressive rules to thwart the purpose of the donor? If the rule in Shelley's Case had never existed, and it was now proposed for the first time, every court and lawyer in the United States would respond with a prompt and emphatic protest against a plan so inconsistent with the spirit of our civilization and so abhorrent to the principles of reason and justice. As this State has never been subject to its influence, we should be no less prompt and earnest in denying it a place in our legal system. The suggestion made by the majority that few instances are likely to arise requiring this court to apply the rule adds nothing to the argument. Few demands have hitherto been made for the enforcement of the rule in Shelley's Case, simply because the great body of the profession has taken this court at its word that such rule is not recognized as the law of Iowa. Now that we have announced otherwise, it requires no prophet's vision to foresee the rapid increase in such litigation. Of the further suggestion that there are other rules and principles of real estate law coming from feudal times which are admittedly in force, though having no apparent justification in modern conditions, I have only to say that, conceding this to be true, I am still unable to admit the soundness of the logic which justifies the adoption of an admittedly vicious rule by showing that we are already burdened with others equally bad.

In my opinion the judgment of the district court should be *reversed.*

SHERWIN, C. J.—I concur in the dissenting opinion of Mr. Justice WEAVER.